## DUNCAN v. LOUISIANA.

No. 410.   Argued January 17, 1968.—Decided May 20, 1968.

*Richard B. Sobol* argued the cause for appellant.   With him on the briefs were *Alvin J. Bronstein* and *Anthony G. Amsterdam.*

*Dorothy D. Wolbrette,* Assistant Attorney General of Louisiana, argued the cause for appellee.   With her on the brief were *Jack P. F. Gremillion,* Attorney General, *William P. Schuler,* Second Assistant Attorney General, *L. K. Clement, Jr.,* and *John M. Currier,* Assistant Attorneys General, *Leander H. Perez, Jr.,* and *Lawrence L. McNamara.*

*Louis J. Lefkowitz,* Attorney General, *Samuel A. Hirshowitz,* First Assistant Attorney General, and *Michael H.*

*Rauch,* Assistant Attorney General, filed a brief for the State of New York, as *amicus curiae.*

MR. JUSTICE WHITE delivered the opinion of the Court.

Appellant, Gary Duncan, was convicted of simple battery in the Twenty-fifth Judicial District Court of Louisiana. Under Louisiana law simple battery is a misdemeanor, punishable by a maximum of two years' imprisonment and a $300 fine. Appellant sought trial by jury, but because the Louisiana Constitution grants jury trials only in cases in which capital punishment or imprisonment at hard labor may be imposed,[1] the trial judge denied the request. Appellant was convicted and sentenced to serve 60 days in the parish prison and pay a fine of $150. Appellant sought review in the Supreme Court of Louisiana, asserting that the denial of jury trial violated rights guaranteed to him by the United States Constitution. The Supreme Court, finding "[n]o error of law in the ruling complained of," denied appellant a writ of certiorari.[2] Pursuant to 28 U. S. C.

---

[1] La. Const., Art. VII, § 41:

"All cases in which the punishment may not be at hard labor shall . . . be tried by the judge without a jury. Cases, in which the punishment may be at hard labor, shall be tried by a jury of five, all of whom must concur to render a verdict; cases, in which the punishment is necessarily at hard labor, by a jury of twelve, nine of whom must concur to render a verdict; cases in which the punishment may be capital, by a jury of twelve, all of whom must concur to render a verdict."

La. Rev. Stat. § 14:35 (1950):

"Simple battery is a battery, without the consent of the victim, committed without a dangerous weapon.

"Whoever commits a simple battery shall be fined not more than three hundred dollars, or imprisoned for not more than two years, or both."

[2] 250 La. 253, 195 So. 2d 142 (1967).

§ 1257 (2) appellant sought review in this Court, alleging that the Sixth and Fourteenth Amendments to the United States Constitution secure the right to jury trial in state criminal prosecutions where a sentence as long as two years may be imposed. We noted probable jurisdiction,[3] and set the case for oral argument with No. 52, *Bloom* v. *Illinois, post,* p. 194.

Appellant was 19 years of age when tried. While driving on Highway 23 in Plaquemines Parish on October 18, 1966, he saw two younger cousins engaged in a conversation by the side of the road with four white boys. Knowing his cousins, Negroes who had recently transferred to a formerly all-white high school, had reported the occurrence of racial incidents at the school, Duncan stopped the car, got out, and approached the six boys. At trial the white boys and a white onlooker testified, as did appellant and his cousins. The testimony was in dispute on many points, but the witnesses agreed that appellant and the white boys spoke to each other, that appellant encouraged his cousins to break off the encounter and enter his car, and that appellant was about to enter the car himself for the purpose of driving away with his cousins. The whites testified that just before getting in the car appellant slapped Herman Landry, one of the white boys, on the elbow. The Negroes testified that appellant had not slapped Landry, but had merely touched him. The trial judge concluded that the State had proved beyond a reasonable doubt that Duncan had committed simple battery, and found him guilty.

## I.

The Fourteenth Amendment denies the States the power to "deprive any person of life, liberty, or property, without due process of law." In resolving conflicting

---

[3] 389 U. S. 809 (1967).

claims concerning the meaning of this spacious language, the Court has looked increasingly to the Bill of Rights for guidance; many of the rights guaranteed by the first eight Amendments to the Constitution have been held to be protected against state action by the Due Process Clause of the Fourteenth Amendment. That clause now protects the right to compensation for property taken by the State;[4] the rights of speech, press, and religion covered by the First Amendment;[5] the Fourth Amendment rights to be free from unreasonable searches and seizures and to have excluded from criminal trials any evidence illegally seized;[6] the right guaranteed by the Fifth Amendment to be free of compelled self-incrimination;[7] and the Sixth Amendment rights to counsel,[8] to a speedy[9] and public[10] trial, to confrontation of opposing witnesses,[11] and to compulsory process for obtaining witnesses.[12]

The test for determining whether a right extended by the Fifth and Sixth Amendments with respect to federal criminal proceedings is also protected against state action by the Fourteenth Amendment has been phrased in a variety of ways in the opinions of this Court. The question has been asked whether a right is among those " 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions,' " *Powell* v. *Alabama,* 287 U. S. 45, 67 (1932);[13] whether

---

[4] *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226 (1897).

[5] See, *e. g., Fiske* v. *Kansas,* 274 U. S. 380 (1927).

[6] See *Mapp* v. *Ohio,* 367 U. S. 643 (1961).

[7] *Malloy* v. *Hogan,* 378 U. S. 1 (1964).

[8] *Gideon* v. *Wainwright,* 372 U. S. 335 (1963).

[9] *Klopfer* v. *North Carolina,* 386 U. S. 213 (1967).

[10] *In re Oliver,* 333 U. S. 257 (1948).

[11] *Pointer* v. *Texas,* 380 U. S. 400 (1965).

[12] *Washington* v. *Texas,* 388 U. S. 14 (1967).

[13] Quoting from *Hebert* v. *Louisiana,* 272 U. S. 312, 316 (1926).

it is "basic in our system of jurisprudence," *In re Oliver,* 333 U. S. 257, 273 (1948); and whether it is "a fundamental right, essential to a fair trial," *Gideon* v. *Wainwright,* 372 U. S. 335, 343–344 (1963); *Malloy* v. *Hogan,* 378 U. S. 1, 6 (1964); *Pointer* v. *Texas,* 380 U. S. 400, 403 (1965). The claim before us is that the right to trial by jury guaranteed by the Sixth Amendment meets these tests. The position of Louisiana, on the other hand, is that the Constitution imposes upon the States no duty to give a jury trial in any criminal case, regardless of the seriousness of the crime or the size of the punishment which may be imposed. Because we believe that trial by jury in criminal cases is fundamental to the American scheme of justice, we hold that the Fourteenth Amendment guarantees a right of jury trial in all criminal cases which—were they to be tried in a federal court—would come within the Sixth Amendment's guarantee.[14] Since we consider the appeal be-

---

[14] In one sense recent cases applying provisions of the first eight Amendments to the States represent a new approach to the "incorporation" debate. Earlier the Court can be seen as having asked, when inquiring into whether some particular procedural safeguard was required of a State, if a civilized system could be imagined that would not accord the particular protection. For example, *Palko* v. *Connecticut,* 302 U. S. 319, 325 (1937), stated: "The right to trial by jury and the immunity from prosecution except as the result of an indictment may have value and importance. Even so, they are not of the very essence of a scheme of ordered liberty. . . . Few would be so narrow or provincial as to maintain that a fair and enlightened system of justice would be impossible without them." The recent cases, on the other hand, have proceeded upon the valid assumption that state criminal processes are not imaginary and theoretical schemes but actual systems bearing virtually every characteristic of the common-law system that has been developing contemporaneously in England and in this country. The question thus is whether given this kind of system a particular procedure is

fore us to be such a case, we hold that the Constitution was violated when appellant's demand for jury trial was refused.

---

fundamental—whether, that is, a procedure is necessary to an Anglo-American regime of ordered liberty. It is this sort of inquiry that can justify the conclusions that state courts must exclude evidence seized in violation of the Fourth Amendment, *Mapp* v. *Ohio,* 367 U. S. 643 (1961); that state prosecutors may not comment on a defendant's failure to testify, *Griffin* v. *California,* 380 U. S. 609 (1965); and that criminal punishment may not be imposed for the status of narcotics addiction, *Robinson* v. *California,* 370 U. S. 660 (1962). Of immediate relevance for this case are the Court's holdings that the States must comply with certain provisions of the Sixth Amendment, specifically that the States may not refuse a speedy trial, confrontation of witnesses, and the assistance, at state expense if necessary, of counsel. See cases cited in nn. 8–12, *supra.* Of each of these determinations that a constitutional provision originally written to bind the Federal Government should bind the States as well it might be said that the limitation in question is not necessarily fundamental to fairness in every criminal system that might be imagined but is fundamental in the context of the criminal processes maintained by the American States.

When the inquiry is approached in this way the question whether the States can impose criminal punishment without granting a jury trial appears quite different from the way it appeared in the older cases opining that States might abolish jury trial. See, *e. g., Maxwell* v. *Dow,* 176 U. S. 581 (1900). A criminal process which was fair and equitable but used no juries is easy to imagine. It would make use of alternative guarantees and protections which would serve the purposes that the jury serves in the English and American systems. Yet no American State has undertaken to construct such a system. Instead, every American State, including Louisiana, uses the jury extensively, and imposes very serious punishments only after a trial at which the defendant has a right to a jury's verdict. In every State, including Louisiana, the structure and style of the criminal process—the supporting framework and the subsidiary procedures—are of the sort that naturally complement jury trial, and have developed in connection with and in reliance upon jury trial.

The history of trial by jury in criminal cases has been frequently told.[15] It is sufficient for present purposes to say that by the time our Constitution was written, jury trial in criminal cases had been in existence in England for several centuries and carried impressive credentials traced by many to Magna Carta.[16] Its preservation and proper operation as a protection against arbitrary rule were among the major objectives of the revolutionary settlement which was expressed in the Declaration and Bill of Rights of 1689. In the 18th century Blackstone could write:

> "Our law has therefore wisely placed this strong and two-fold barrier, of a presentment and a trial by jury, between the liberties of the people and the prerogative of the crown. It was necessary, for preserving the admirable balance of our constitution, to vest the executive power of the laws in the prince: and yet this power might be dangerous and destructive to that very constitution, if exerted without check or control, by justices of *oyer* and *terminer* occasionally named by the crown; who might then, as in France or Turkey, imprison, dispatch, or exile any man that was obnoxious to the government, by an instant declaration that such is their will and pleasure. But the founders of the English law have, with excellent forecast, contrived that . . . the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unani-

[15] *E. g.*, W. Forsyth, History of Trial by Jury (1852); J. Thayer, A Preliminary Treatise on Evidence at the Common Law (1898); W. Holdsworth, History of English Law.

[16] *E. g.*, 4 W. Blackstone, Commentaries on the Laws of England 349 (Cooley ed. 1899). Historians no longer accept this pedigree. See, *e. g.*, 1 F. Pollock & F. Maitland, The History of English Law Before the Time of Edward I, at 173, n. 3 (2d ed. 1909).

mous suffrage of twelve of his equals and neighbours, indifferently chosen and superior to all suspicion." [17]

Jury trial came to America with English colonists, and received strong support from them. Royal interference with the jury trial was deeply resented. Among the resolutions adopted by the First Congress of the American Colonies (the Stamp Act Congress) on October 19, 1765—resolutions deemed by their authors to state "the most essential rights and liberties of the colonists" [18]— was the declaration:

> "That trial by jury is the inherent and invaluable right of every British subject in these colonies."

The First Continental Congress, in the resolve of October 14, 1774, objected to trials before judges dependent upon the Crown alone for their salaries and to trials in England for alleged crimes committed in the colonies; the Congress therefore declared:

> "That the respective colonies are entitled to the common law of England, and more especially to the great and inestimable privilege of being tried by their peers of the vicinage, according to the course of that law." [19]

The Declaration of Independence stated solemn objections to the King's making "Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries," to his "depriving us in many cases, of the benefits of Trial by Jury," and to his "transporting us beyond Seas to be tried for pretended offenses." The Constitution itself, in Art. III, § 2, commanded:

> "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall

---

[17] Blackstone, *supra*, at 349–350.

[18] R. Perry, ed., Sources of Our Liberties 270 (1959).

[19] *Id.*, at 288.

be held in the State where the said Crimes shall have been committed."

Objections to the Constitution because of the absence of a bill of rights were met by the immediate submission and adoption of the Bill of Rights. Included was the Sixth Amendment which, among other things, provided:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." [20]

The constitutions adopted by the original States guaranteed jury trial. Also, the constitution of every State entering the Union thereafter in one form or another protected the right to jury trial in criminal cases.

Even such skeletal history is impressive support for considering the right to jury trial in criminal cases to be fundamental to our system of justice, an importance

---

[20] Among the proposed amendments adopted by the House of Representatives in 1789 and submitted to the Senate was Article Fourteen:

"No State shall infringe the right of trial by Jury in criminal cases, nor the rights of conscience, nor the freedom of speech, or of the press."

The Senate deleted this article in adopting the amendments which became the Bill of Rights. Journal of the First Session of the Senate 72; 1 Annals of Congress 76; Brennan, The Bill of Rights and the States, in E. Cahn, The Great Rights 65, 69 (1963); E. Dumbauld, The Bill of Rights 46, 215 (1957). This relatively clear indication that the framers of the Sixth Amendment did not intend its jury trial requirement to bind the States is, of course, of little relevance to interpreting the Due Process Clause of the Fourteenth Amendment, adopted specifically to place limitations upon the States. Cf. *Fiske* v. *Kansas*, 274 U. S. 380 (1927); *Gitlow* v. *New York*, 268 U. S. 652, 666 (1925).

frequently recognized in the opinions of this Court. For example, the Court has said:

"Those who emigrated to this country from England brought with them this great privilege 'as their birthright and inheritance, as a part of that admirable common law which had fenced around and interposed barriers on every side against the approaches of arbitrary power.' "[21]

Jury trial continues to receive strong support. The laws of every State guarantee a right to jury trial in serious criminal cases; no State has dispensed with it; nor are there significant movements underway to do so. Indeed, the three most recent state constitutional revisions, in Maryland, Michigan, and New York, carefully preserved the right of the accused to have the judgment of a jury when tried for a serious crime.[22]

We are aware of prior cases in this Court in which the prevailing opinion contains statements contrary to our holding today that the right to jury trial in serious criminal cases is a fundamental right and hence must be recognized by the States as part of their obligation to extend due process of law to all persons within their jurisdiction. Louisiana relies especially on *Maxwell* v. *Dow,* 176 U. S. 581 (1900); *Palko* v. *Connecticut,* 302 U. S. 319 (1937); and *Snyder* v. *Massachusetts,* 291 U. S. 97 (1934). None of these cases, however, dealt with a State which had purported to dispense entirely with a

[21] *Thompson* v. *Utah,* 170 U. S. 343, 349–350 (1898), quoting 2 J. Story, Commentaries on the Constitution of the United States § 1779. See also *Irvin* v. *Dowd,* 366 U. S. 717, 721–722 (1961); *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11, 16 (1955); *Ex parte Milligan,* 4 Wall. 2, 122–123 (1866); *People* v. *Garbutt,* 17 Mich. 9, 27 (1868).

[22] Proposed Maryland Constitution, Art. 1, § 1.07 (defeated at referendum May 14, 1968); Michigan Constitution, Art. 1, § 14; Proposed New York Constitution, Art. 1, § 7b (defeated at referendum Nov. 7, 1967).

jury trial in serious criminal cases. *Maxwell* held that no provision of the Bill of Rights applied to the States— a position long since repudiated—and that the Due Process Clause of the Fourteenth Amendment did not prevent a State from trying a defendant for a noncapital offense with fewer than 12 men on the jury. It did not deal with a case in which no jury at all had been provided. In neither *Palko* nor *Snyder* was jury trial actually at issue, although both cases contain important dicta asserting that the right to jury trial is not essential to ordered liberty and may be dispensed with by the States regardless of the Sixth and Fourteenth Amendments. These observations, though weighty and respectable, are nevertheless dicta, unsupported by holdings in this Court that a State may refuse a defendant's demand for a jury trial when he is charged with a serious crime. Perhaps because the right to jury trial was not directly at stake, the Court's remarks about the jury in *Palko* and *Snyder* took no note of past or current developments regarding jury trials, did not consider its purposes and functions, attempted no inquiry into how well it was performing its job, and did not discuss possible distinctions between civil and criminal cases. In *Malloy* v. *Hogan, supra,* the Court rejected *Palko*'s discussion of the self-incrimination clause. Respectfully, we reject the prior dicta regarding jury trial in criminal cases.

The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government.[23]

---

[23] "The [jury trial] clause was clearly intended to protect the accused from oppression by the Government . . . ." *Singer* v. *United States,* 380 U. S. 24, 31 (1965).

"The first object of any tyrant in Whitehall would be to make Parliament utterly subservient to his will; and the next to overthrow or diminish trial by jury, for no tyrant could afford to leave

Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it. Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges. Fear of unchecked power, so typical of our State and Federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or innocence. The deep commitment of the Nation to the right of jury trial in serious criminal cases as a defense against arbitrary law enforcement qualifies for protection under the Due Process Clause of the Fourteenth Amendment, and must therefore be respected by the States.

Of course jury trial has "its weaknesses and the potential for misuse," *Singer* v. *United States,* 380 U. S. 24, 35 (1965). We are aware of the long debate, especially in this century, among those who write about the admin-

a subject's freedom in the hands of twelve of his countrymen. So that trial by jury is more than an instrument of justice and more than one wheel of the constitution: it is the lamp that shows that freedom lives." P. Devlin, Trial by Jury 164 (1956).

istration of justice, as to the wisdom of permitting untrained laymen to determine the facts in civil and criminal proceedings.[24] Although the debate has been intense, with powerful voices on either side, most of the controversy has centered on the jury in civil cases. Indeed, some of the severest critics of civil juries acknowledge that the arguments for criminal juries are much stronger.[25] In addition, at the heart of the dispute have been express or implicit assertions that juries are incapable of adequately understanding evidence or determining issues of fact, and that they are unpredictable, quixotic, and little better than a roll of dice. Yet, the most recent and exhaustive study of the jury in criminal cases concluded that juries do understand the evidence and come to sound conclusions in most of the cases presented to them and that when juries differ with the result at which the judge would have arrived, it is usually because they are serving some of the very purposes for which they were created and for which they are now employed.[26]

The State of Louisiana urges that holding that the Fourteenth Amendment assures a right to jury trial will cast doubt on the integrity of every trial conducted without a jury. Plainly, this is not the import of our holding. Our conclusion is that in the American States, as in the federal judicial system, a general grant of jury trial for

[24] A thorough summary of the arguments that have been made for and against jury trial and an extensive bibliography of the relevant literature is available at Hearings on Recording of Jury Deliberations before the Subcommittee to Investigate the Administration of the Internal Security Act of the Senate Committee on the Judiciary, 84th Cong., 1st Sess., 63–81 (1955). A more selective bibliography appears at H. Kalven, Jr. & H. Zeisel, The American Jury 4, n. 2 (1966).

[25] *E. g.*, J. Frank, Courts on Trial 145 (1949); H. Sidgwick, The Elements of Politics 498 (4th ed. 1919).

[26] Kalven & Zeisel, n. 24, *supra.*

serious offenses is a fundamental right, essential for pre-
venting miscarriages of justice and for assuring that fair
trials are provided for all defendants. We would not
assert, however, that every criminal trial—or any par-
ticular trial—held before a judge alone is unfair or that
a defendant may never be as fairly treated by a judge
as he would be by a jury. Thus we hold no constitu-
tional doubts about the practices, common in both federal
and state courts, of accepting waivers of jury trial [27] and
prosecuting petty crimes without extending a right to
jury trial.[28] However, the fact is that in most places
more trials for serious crimes are to juries than to a
court alone; a great many defendants prefer the judg-
ment of a jury to that of a court.[29] Even where defend-
ants are satisfied with bench trials, the right to a jury
trial very likely serves its intended purpose of making
judicial or prosecutorial unfairness less likely.[30]

[27] See *Patton* v. *United States,* 281 U. S. 276 (1930).

[28] See Part II, *infra.*

[29] Kalven & Zeisel, n. 24, *supra,* c. 2.

[30] Louisiana also asserts that if due process is deemed to include
the right to jury trial, States will be obligated to comply with all
past interpretations of the Sixth Amendment, an amendment which
in its inception was designed to control only the federal courts and
which throughout its history has operated in this limited environ-
ment where uniformity is a more obvious and immediate considera-
tion. In particular, Louisiana objects to application of the decisions
of this Court interpreting the Sixth Amendment as guaranteeing a
12-man jury in serious criminal cases, *Thompson* v. *Utah,* 170 U. S.
343 (1898); as requiring a unanimous verdict before guilt can be
found, *Maxwell* v. *Dow,* 176 U. S. 581, 586 (1900); and as barring
procedures by which crimes subject to the Sixth Amendment jury
trial provision are tried in the first instance without a jury but at
the first appellate stage by *de novo* trial with a jury, *Callan* v.
*Wilson,* 127 U. S. 540, 557 (1888). It seems very unlikely to
us that our decision today will require widespread changes in state
criminal processes. First, our decisions interpreting the Sixth
Amendment are always subject to reconsideration, a fact amply
demonstrated by the instant decision. In addition, most of the

## II.

Louisiana's final contention is that even if it must grant jury trials in serious criminal cases, the conviction before us is valid and constitutional because here the petitioner was tried for simple battery and was sentenced to only 60 days in the parish prison. We are not persuaded. It is doubtless true that there is a category of petty crimes or offenses which is not subject to the Sixth Amendment jury trial provision [31] and should not be subject to the Fourteenth Amendment jury trial requirement here applied to the States. Crimes carrying possible penalties up to six months do not require a jury trial if they otherwise qualify as petty offenses, *Cheff* v. *Schnackenberg,* 384 U. S. 373 (1966). But the penalty authorized for a particular crime is of major relevance in determining whether it is serious or not and may in itself, if severe enough, subject the trial to the mandates of the Sixth Amendment. *District of Columbia* v.

States have provisions for jury trials equal in breadth to the Sixth Amendment, if that amendment is construed, as it has been, to permit the trial of petty crimes and offenses without a jury. Indeed, there appear to be only four States in which juries of fewer than 12 can be used without the defendant's consent for offenses carrying a maximum penalty of greater than one year. Only in Oregon and Louisiana can a less-than-unanimous jury convict for an offense with a maximum penalty greater than one year. However 10 States authorize first-stage trials without juries for crimes carrying lengthy penalties; these States give a convicted defendant the right to a *de novo* trial before a jury in a different court. The statutory provisions are listed in the briefs filed in this case.

[31] *Cheff* v. *Schnackenberg,* 384 U. S. 373 (1966); *District of Columbia* v. *Clawans,* 300 U. S. 617 (1937); *Schick* v. *United States,* 195 U. S. 65 (1904); *Natal* v. *Louisiana,* 139 U. S. 621 (1891); see *Callan* v. *Wilson,* 127 U. S. 540 (1888). See generally Frankfurter & Corcoran, Petty Federal Offenses and the Constitutional Guaranty of Trial by Jury, 39 Harv. L. Rev. 917 (1926); Kaye, Petty Offenders Have No Peers!, 26 U. Chi. L. Rev. 245 (1959).

*Clawans*, 300 U. S. 617 (1937). The penalty authorized by the law of the locality may be taken "as a gauge of its social and ethical judgments," 300 U. S., at 628, of the crime in question. In *Clawans* the defendant was jailed for 60 days, but it was the 90-day authorized punishment on which the Court focused in determining that the offense was not one for which the Constitution assured trial by jury. In the case before us the Legislature of Louisiana has made simple battery a criminal offense punishable by imprisonment for up to two years and a fine. The question, then, is whether a crime carrying such a penalty is an offense which Louisiana may insist on trying without a jury.

We think not. So-called petty offenses were tried without juries both in England and in the Colonies and have always been held to be exempt from the otherwise comprehensive language of the Sixth Amendment's jury trial provisions. There is no substantial evidence that the Framers intended to depart from this established common-law practice, and the possible consequences to defendants from convictions for petty offenses have been thought insufficient to outweigh the benefits to efficient law enforcement and simplified judicial administration resulting from the availability of speedy and inexpensive nonjury adjudications. These same considerations compel the same result under the Fourteenth Amendment. Of course the boundaries of the petty offense category have always been ill-defined, if not ambulatory. In the absence of an explicit constitutional provision, the definitional task necessarily falls on the courts, which must either pass upon the validity of legislative attempts to identify those petty offenses which are exempt from jury trial or, where the legislature has not addressed itself to the problem, themselves face the question in the first instance. In either case it is necessary to draw a line in the spectrum of crime, separating petty from serious

infractions. This process, although essential, cannot be wholly satisfactory, for it requires attaching different consequences to events which, when they lie near the line, actually differ very little.

In determining whether the length of the authorized prison term or the seriousness of other punishment is enough in itself to require a jury trial, we are counseled by *District of Columbia* v. *Clawans, supra,* to refer to objective criteria, chiefly the existing laws and practices in the Nation. In the federal system, petty offenses are defined as those punishable by no more than six months in prison and a $500 fine.[32] In 49 of the 50 States crimes subject to trial without a jury, which occasionally include simple battery, are punishable by no more than one year in jail.[33] Moreover, in the late 18th century in America crimes triable without a jury were for the most part punishable by no more than a six-month prison term, although there appear to have been exceptions to this rule.[34] We need not, however, settle in this case the exact location of the line between petty offenses and serious crimes. It is sufficient for our purposes to hold

[32] 18 U. S. C. § 1.

[33] Indeed, there appear to be only two instances, aside from the Louisiana scheme, in which a State denies jury trial for a crime punishable by imprisonment for longer than six months. New Jersey's disorderly conduct offense, N. J. Stat. Ann. § 2A:169-4 (1953), carries a one-year maximum sentence but no jury trial. The denial of jury trial was upheld by a 4-3 vote against state constitutional attack in *State* v. *Maier,* 13 N. J. 235, 99 A. 2d 21 (1953). New York State provides a jury within New York City only for offenses bearing a maximum sentence greater than one year. See *People* v. *Sanabria,* 42 Misc. 2d 464, 249 N. Y. S. 2d 66 (Sup. Ct. 1964).

[34] Frankfurter & Corcoran, n. 31, *supra.* In the instant case Louisiana has not argued that a penalty of two years' imprisonment is sufficiently short to qualify as a "petty offense," but only that the penalty actually imposed on Duncan, imprisonment for 60 days, is within the petty offense category.

that a crime punishable by two years in prison is, based on past and contemporary standards in this country, a serious crime and not a petty offense.[35]   Consequently, appellant was entitled to a jury trial and it was error to deny it.

The judgment below is reversed and the case is remanded for proceedings not inconsistent with this opinion.

[For concurring opinion of MR. JUSTICE FORTAS, see *post,* p. 211.]

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, concurring.

The Court today holds that the right to trial by jury guaranteed defendants in criminal cases in federal courts by Art. III of the United States Constitution and by the Sixth Amendment is also guaranteed by the Fourteenth Amendment to defendants tried in state courts.   With

---

[35] It is argued that *Cheff* v. *Schnackenberg,* 384 U. S. 373 (1966), interpreted the Sixth Amendment as meaning that to the extent that the length of punishment is a relevant criterion in distinguishing between serious crimes and petty offenses, the critical factor is not the length of the sentence authorized but the length of the penalty actually imposed.   In our view that case does not reach the situation where a legislative judgment as to the seriousness of the crime is imbedded in the statute in the form of an express authorization to impose a heavy penalty for the crime in question.   *Cheff* involved criminal contempt, an offense applied to a wide range of conduct including conduct not so serious as to require jury trial absent a long sentence.   In addition criminal contempt is unique in that legislative bodies frequently authorize punishment without stating the extent of the penalty which can be imposed.   The contempt statute under which *Cheff* was prosecuted, 18 U. S. C. § 401, treated the extent of punishment as a matter to be determined by the forum court.   It is therefore understandable that this Court in *Cheff* seized upon the penalty actually imposed as the best evidence of the seriousness of the offense for which *Cheff* was tried.

this holding I agree for reasons given by the Court. I also agree because of reasons given in my dissent in *Adamson* v. *California,* 332 U. S. 46, 68. In that dissent, at 90, I took the position, contrary to the holding in *Twining* v. *New Jersey,* 211 U. S. 78, that the Fourteenth Amendment made all of the provisions of the Bill of Rights applicable to the States. This Court in *Palko* v. *Connecticut,* 302 U. S. 319, 323, decided in 1937, although saying "[t]here is no such general rule," went on to add that the Fourteenth Amendment may make it unlawful for a State to abridge by its statutes the

> "freedom of speech which the First Amendment safeguards against encroachment by the Congress . . . or the like freedom of the press . . . or the free exercise of religion . . . or the right of peaceable assembly . . . or the right of one accused of crime to the benefit of counsel . . . . In these and other situations immunities that are valid as against the federal government by force of the specific pledges of particular amendments have been found to be implicit in the concept of ordered liberty, and thus, through the Fourteenth Amendment, become valid as against the states." *Id.,* at 324–325.

And the *Palko* opinion went on to explain, 302 U. S., at 326, that certain Bill of Rights' provisions were made applicable to the States by bringing them "within the Fourteenth Amendment by a process of absorption." Thus *Twining* v. *New Jersey, supra,* refused to hold that any one of the Bill of Rights' provisions was made applicable to the States by the Fourteenth Amendment, but *Palko,* which must be read as overruling *Twining* on this point, concluded that the Bill of Rights Amendments that are "implicit in the concept of ordered liberty" are "absorbed" by the Fourteenth as protections against

state invasion. In this situation I said in *Adamson* v. *California,* 332 U. S., at 89, that, while "I would . . . extend to all the people of the nation the complete protection of the Bill of Rights," that "[i]f the choice must be between the selective process of the *Palko* decision applying some of the Bill of Rights to the States, or the *Twining* rule applying none of them, I would choose the *Palko* selective process." See *Gideon* v. *Wainwright,* 372 U. S. 335. And I am very happy to support this selective process through which our Court has since the *Adamson* case held most of the specific Bill of Rights' protections applicable to the States to the same extent they are applicable to the Federal Government. Among these are the right to trial by jury decided today, the right against compelled self-incrimination, the right to counsel, the right to compulsory process for witnesses, the right to confront witnesses, the right to a speedy and public trial, and the right to be free from unreasonable searches and seizures.

All of these holdings making Bill of Rights' provisions applicable as such to the States mark, of course, a departure from the *Twining* doctrine holding that none of those provisions were enforceable as such against the States. The dissent in this case, however, makes a spirited and forceful defense of that now discredited doctrine. I do not believe that it is necessary for me to repeat the historical and logical reasons for my challenge to the *Twining* holding contained in my *Adamson* dissent and Appendix to it. What I wrote there in 1947 was the product of years of study and research. My appraisal of the legislative history followed 10 years of legislative experience as a Senator of the United States, not a bad way, I suspect, to learn the value of what is said in legislative debates, committee discussions, committee reports, and various other steps taken in the course of passage of bills, resolutions,

and proposed constitutional amendments. My Brother HARLAN's objections to my *Adamson* dissent history, like that of most of the objectors, relies most heavily on a criticism written by Professor Charles Fairman and published in the Stanford Law Review. 2 Stan. L. Rev. 5 (1949). I have read and studied this article extensively, including the historical references, but am compelled to add that in my view it has completely failed to refute the inferences and arguments that I suggested in my *Adamson* dissent. Professor Fairman's "history" relies very heavily on what was *not* said in the state legislatures that passed on the Fourteenth Amendment. Instead of relying on this kind of negative pregnant, my legislative experience has convinced me that it is far wiser to rely on what *was* said, and most importantly, said by the men who actually sponsored the Amendment in the Congress. I know from my years in the United States Senate that it is to men like Congressman Bingham, who steered the Amendment through the House, and Senator Howard, who introduced it in the Senate, that members of Congress look when they seek the real meaning of what is being offered. And they vote for or against a bill based on what the sponsors of that bill and those who oppose it tell them it means. The historical appendix to my *Adamson* dissent leaves no doubt in my mind that both its sponsors and those who opposed it believed the Fourteenth Amendment made the first eight Amendments of the Constitution (the Bill of Rights) applicable to the States.

In addition to the adoption of Professor Fairman's "history," the dissent states that "the great words of the four clauses of the first section of the Fourteenth Amendment would have been an exceedingly peculiar way to say that 'The rights heretofore guaranteed against federal intrusion by the first eight Amendments are henceforth guaranteed against state intrusion as

well.' " Dissenting opinion, n. 9. In response to this I can say only that the words "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States" seem to me an eminently reasonable way of expressing the idea that henceforth the Bill of Rights shall apply to the States.[1] What more precious "privilege" of American citizenship could there be than that privilege to claim the protections of our great Bill of Rights? I suggest that any reading of "privileges or immunities of citizens of the United States" which excludes the Bill of Rights' safeguards renders the words of this section of the Fourteenth Amendment meaningless. Senator Howard, who introduced the Fourteenth Amendment for passage in the Senate, certainly read the words this way. Although I have cited his speech at length in my *Adamson* dissent appendix, I believe it would be worthwhile to reproduce a part of it here.

> "Such is the character of the privileges and immunities spoken of in the second section of the fourth article of the Constitution [the Senator had just read from the old opinion of *Corfield* v. *Coryell,* 6 Fed. Cas. 546 (No. 3,230) (E. D. Pa. 1825)]. To these privileges and immunities, whatever they may be— for they are not and cannot be fully defined in their entire extent and precise nature—to these should be added the personal rights guarantied and secured by the first eight amendments of the Constitution; such as the freedom of speech and of the press; the right of the people peaceably to assemble and petition the Government for a redress of grievances, a right ap-

---

[1] My view has been and is that the Fourteenth Amendment, *as a whole,* makes the Bill of Rights applicable to the States. This would certainly include the language of the Privileges and Immunities Clause, as well as the Due Process Clause.

pertaining to each and all the people; the right to keep and to bear arms; the right to be exempted from the quartering of soldiers in a house without the consent of the owner; the right to be exempt from unreasonable searches and seizures, and from any search or seizure except by virtue of a warrant issued upon a formal oath or affidavit; the right of an accused person to be informed of the nature of the accusation against him, and his right to be tried by an impartial jury of the vicinage; and also the right to be secure against excessive bail and against cruel and unusual punishments.

"Now, sir, here is a mass of privileges, immunities, and rights, some of them secured by the second section of the fourth article of the Constitution, which I have recited, some by the first eight amendments of the Constitution; and it is a fact well worthy of attention that the course of decision of our courts and the present settled doctrine is, that all these immunities, privileges, rights, thus guarantied by the Constitution or recognized by it, are secured to the citizens solely as a citizen of the United States and as a party in their courts. They do not operate in the slightest degree as a restraint or prohibition upon State legislation. . . .

". . . The great object of the first section of this amendment is, therefore, to restrain the power of the States and compel them at all times to respect these great fundamental guarantees." Cong. Globe, 39th Cong., 1st Sess., 2765–2766 (1866).

From this I conclude, contrary to my Brother HARLAN, that if anything, it is "exceedingly peculiar" to read the Fourteenth Amendment differently from the way I do.

While I do not wish at this time to discuss at length my disagreement with Brother HARLAN's forthright and frank restatement of the now discredited *Twining* doc-

trine,[2] I do want to point out what appears to me to be the basic difference between us. His view, as was indeed the view of *Twining*, is that "due process is an evolving concept" and therefore that it entails a "gradual process of judicial inclusion and exclusion" to ascertain those "immutable principles . . . of free government which no member of the Union may disregard." Thus the Due Process Clause is treated as prescribing no specific and clearly ascertainable constitutional command that judges must obey in interpreting the Constitution, but rather as leaving judges free to decide at any particular time whether a particular rule or judicial formulation embodies an "immutable principl[e] of free government" or is "implicit in the concept of ordered liberty," or whether certain conduct "shocks the judge's conscience" or runs counter to some other similar, undefined and undefinable standard. Thus due process, according to my Brother HARLAN, is to be a phrase with no permanent meaning, but one which is found to shift from time to time in accordance with judges' predilections and understandings of what is best for the country. If due process means this, the Fourteenth Amendment, in my opinion, might as well have been written that "no person shall be deprived of life, liberty or property except by laws that the judges of the United States Supreme Court shall find to be consistent with the immutable principles of free government." It is impossible for me to believe that such unconfined power is given to judges in our Constitution that is a written one in order to limit governmental power.

Another tenet of the *Twining* doctrine as restated by my Brother HARLAN is that "due process of law requires only fundamental fairness." But the "fundamental

---

[2] For a more thorough exposition of my views against this approach to the Due Process Clause, see my concurring opinion in *Rochin* v. *California*, 342 U. S. 165, 174.

fairness" test is one on a par with that of shocking the conscience of the Court. Each of such tests depends entirely on the particular judge's idea of ethics and morals instead of requiring him to depend on the boundaries fixed by the written words of the Constitution. Nothing in the history of the phrase "due process of law" suggests that constitutional controls are to depend on any particular judge's sense of values. The origin of the Due Process Clause is Chapter 39 of Magna Carta which declares that "No free man shall be taken, outlawed, banished, or in any way destroyed, nor will We proceed against or prosecute him, except by the lawful judgment of his peers and by the *law of the land.*" [3] (Emphasis added.) As early as 1354 the words "due process of law" were used in an English statute interpreting Magna Carta,[4] and by the end of the 14th century "due process of law" and "law of the land" were interchangeable. Thus the origin of this clause was an attempt by those who wrote Magna Carta to do away with the so-called trials of that period where people were liable to sudden arrest and summary conviction in courts and by judicial commissions with no sure and definite procedural protections and under laws that might have been improvised to try their particular cases. Chapter 39 of Magna Carta was a guarantee that the government would take neither life, liberty, nor property without a trial in accord with the law of the land that already existed at the time the alleged offense was committed. This means that the Due Process Clause gives all Americans, whoever they are and wherever they happen to be, the right to be tried by independent and unprejudiced courts using established procedures and applying valid pre-existing laws. There is not one word of legal history that justifies making the

---

[3] See *Murray's Lessee* v. *Hoboken Land and Improvement Co.,* 18 How. 272, 276.

[4] 28 Edw. 3, c. 3 (1354).

term "due process of law" mean a guarantee of a trial free from laws and conduct which the courts deem at the time to be "arbitrary," "unreasonable," "unfair," or "contrary to civilized standards." The due process of law standard for a trial is one in accordance with the Bill of Rights and laws passed pursuant to constitutional power, guaranteeing to all alike a trial under the general law of the land.

Finally I want to add that I am not bothered by the argument that applying the Bill of Rights to the States, "according to the same standards that protect those personal rights against federal encroachment," [5] interferes with our concept of federalism in that it may prevent States from trying novel social and economic experiments. I have never believed that under the guise of federalism the States should be able to experiment with the protections afforded our citizens through the Bill of Rights. As Justice Goldberg said so wisely in his concurring opinion in *Pointer* v. *Texas,* 380 U. S. 400:

> "to deny to the States the power to impair a fundamental constitutional right is not to increase federal power, but, rather, to limit the power of both federal and state governments in favor of safeguarding the fundamental rights and liberties of the individual. In my view this promotes rather than undermines the basic policy of avoiding excess concentration of power in government, federal or state, which underlies our concepts of federalism." 380 U. S., at 414.

It seems to me totally inconsistent to advocate, on the one hand, the power of this Court to strike down any state law or practice which it finds "unreasonable" or "unfair" and, on the other hand, urge that the States be

---

[5] See *Malloy* v. *Hogan,* 378 U. S. 1, 10; *Pointer* v. *Texas,* 380 U. S. 400, 406; *Miranda* v. *Arizona,* 384 U. S. 436, 464.

given maximum power to develop their own laws and procedures. Yet the due process approach of my Brothers HARLAN and FORTAS (see other concurring opinion, *post,* p. 211) does just that since in effect it restricts the States to practices which a majority of this Court is willing to approve on a case-by-case basis. No one is more concerned than I that the States be allowed to use the full scope of their powers as their citizens see fit. And that is why I have continually fought against the expansion of this Court's authority over the States through the use of a broad, general interpretation of due process that permits judges to strike down state laws they do not like.

In closing I want to emphasize that I believe as strongly as ever that the Fourteenth Amendment was intended to make the Bill of Rights applicable to the States. I have been willing to support the selective incorporation doctrine, however, as an alternative, although perhaps less historically supportable than complete incorporation. The selective incorporation process, if used properly, does limit the Supreme Court in the Fourteenth Amendment field to specific Bill of Rights' protections only and keeps judges from roaming at will in their own notions of what policies outside the Bill of Rights are desirable and what are not. And, most importantly for me, the selective incorporation process has the virtue of having already worked to make most of the Bill of Rights' protections applicable to the States.

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, dissenting.

Every American jurisdiction provides for trial by jury in criminal cases. The question before us is not whether jury trial is an ancient institution, which it is; nor whether it plays a significant role in the administration

of criminal justice, which it does; nor whether it will endure, which it shall. The question in this case is whether the State of Louisiana, which provides trial by jury for all felonies, is prohibited by the Constitution from trying charges of simple battery to the court alone. In my view, the answer to that question, mandated alike by our constitutional history and by the longer history of trial by jury, is clearly "no."

The States have always borne primary responsibility for operating the machinery of criminal justice within their borders, and adapting it to their particular circumstances. In exercising this responsibility, each State is compelled to conform its procedures to the requirements of the Federal Constitution. The Due Process Clause of the Fourteenth Amendment requires that those procedures be fundamentally fair in all respects. It does not, in my view, impose or encourage nationwide uniformity for its own sake; it does not command adherence to forms that happen to be old; and it does not impose on the States the rules that may be in force in the federal courts except where such rules are also found to be essential to basic fairness.

The Court's approach to this case is an uneasy and illogical compromise among the views of various Justices on how the Due Process Clause should be interpreted. The Court does not say that those who framed the Fourteenth Amendment intended to make the Sixth Amendment applicable to the States. And the Court concedes that it finds nothing unfair about the procedure by which the present appellant was tried. Nevertheless, the Court reverses his conviction: it holds, for some reason not apparent to me, that the Due Process Clause incorporates the particular clause of the Sixth Amendment that requires trial by jury in federal criminal cases—including, as I read its opinion, the sometimes trivial accompanying baggage of judicial interpretation in federal contexts.

I have raised my voice many times before against the Court's continuing undiscriminating insistence upon fastening on the States federal notions of criminal justice,[1] and I must do so again in this instance. With all respect, the Court's approach and its reading of history are altogether topsy-turvy.

## I.

I believe I am correct in saying that every member of the Court for at least the last 135 years has agreed that our Founders did not consider the requirements of the Bill of Rights so fundamental that they should operate directly against the States.[2] They were wont to believe rather that the security of liberty in America rested primarily upon the dispersion of governmental power across a federal system.[3] The Bill of Rights was considered unnecessary by some[4] but insisted upon by others in order to curb the possibility of abuse of power by the strong central government they were creating.[5]

The Civil War Amendments dramatically altered the relation of the Federal Government to the States. The first section of the Fourteenth Amendment imposes

---

[1] See, e. g., my opinions in *Mapp* v. *Ohio*, 367 U. S. 643, 672 (dissenting); *Ker* v. *California*, 374 U. S. 23, 44 (concurring); *Malloy* v. *Hogan*, 378 U. S. 1, 14 (dissenting); *Pointer* v. *Texas*, 380 U. S. 400, 408 (concurring); *Griffin* v. *California*, 380 U. S. 609, 615 (concurring); *Klopfer* v. *North Carolina*, 386 U. S. 213, 226 (concurring).

[2] *Barron* v. *Baltimore*, 7 Pet. 243 (1833), held that the first eight Amendments restricted only federal action.

[3] The *locus classicus* for this viewpoint is The Federalist No. 51 (Madison).

[4] The Bill of Rights was opposed by Hamilton and other proponents of a strong central government. See The Federalist No. 84; see generally C. Rossiter, 1787: The Grand Convention 284, 302–303.

[5] In *Barron* v. *Baltimore, supra,* at 250, Chief Justice Marshall said, "These amendments demanded security against the apprehended encroachments of the general government—not against those of the local governments."

highly significant restrictions on state action. But the restrictions are couched in very broad and general terms: citizenship; privileges and immunities; due process of law; equal protection of the laws. Consequently, for 100 years this Court has been engaged in the difficult process Professor Jaffe has well called "the search for intermediate premises." [6] The question has been, Where does the Court properly look to find the specific rules that define and give content to such terms as "life, liberty, or property" and "due process of law"?

A few members of the Court have taken the position that the intention of those who drafted the first section of the Fourteenth Amendment was simply, and exclusively, to make the provisions of the first eight Amendments applicable to state action. [7] This view has never been accepted by this Court. In my view, often expressed elsewhere, [8] the first section of the Fourteenth Amendment was meant neither to incorporate, nor to be limited to, the specific guarantees of the first eight Amendments. The overwhelming historical evidence marshalled by Professor Fairman demonstrates, to me conclusively, that the Congressmen and state legislators who wrote, debated, and ratified the Fourteenth Amendment did not think they were "incorporating" the Bill of Rights [9] and

[6] Jaffe, Was Brandeis an Activist? The Search for Intermediate Premises, 80 Harv. L. Rev. 986 (1967).

[7] See *Adamson* v. *California*, 332 U. S. 46, 71 (dissenting opinion of BLACK, J.); *O'Neil* v. *Vermont*, 144 U. S. 323, 366, 370 (dissenting opinion of Harlan, J.) (1892); H. Black, "Due Process of Law," in A Constitutional Faith 23 (1968).

[8] In addition to the opinions cited in n. 1, *supra*, see, *e. g.*, my opinions in *Poe* v. *Ullman*, 367 U. S. 497, 522, at 539–545 (dissenting), and *Griswold* v. *Connecticut*, 381 U. S. 479, 499 (concurring).

[9] Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights? The Original Understanding, 2 Stan. L. Rev. 5 (1949). Professor Fairman was not content to rest upon the overwhelming

the very breadth and generality of the Amendment's provisions suggest that its authors did not suppose that the Nation would always be limited to mid-19th century conceptions of "liberty" and "due process of law" but that the increasing experience and evolving conscience of the American people would add new "intermediate premises." In short, neither history, nor sense, supports using the Fourteenth Amendment to put the States in a

---

fact that the great words of the four clauses of the first section of the Fourteenth Amendment would have been an exceedingly peculiar way to say that "The rights heretofore guaranteed against federal intrusion by the first eight Amendments are henceforth guaranteed against state intrusion as well." He therefore sifted the mountain of material comprising the debates and committee reports relating to the Amendment in both Houses of Congress and in the state legislatures that passed upon it. He found that in the immense corpus of comments on the purpose and effects of the proposed amendment, and on its virtues and defects, there is almost no evidence whatever for "incorporation." The first eight Amendments are so much as mentioned by only two members of Congress, one of whom effectively demonstrated (a) that he did not understand *Barron* v. *Baltimore,* 7 Pet. 243, and therefore did not understand the question of incorporation, and (b) that he was not himself understood by his colleagues. One state legislative committee report, rejected by the legislature as a whole, found § 1 of the Fourteenth Amendment superfluous because it duplicated the Bill of Rights: the committee obviously did not understand *Barron* v. *Baltimore* either. That is all Professor Fairman could find, in hundreds of pages of legislative discussion prior to passage of the Amendment, that even suggests incorporation.

To this negative evidence the judicial history of the Amendment could be added. For example, it proved possible for a Court whose members had lived through Reconstruction to reiterate the doctrine of *Barron* v. *Baltimore,* that the Bill of Rights did not apply to the States, without so much as questioning whether the Fourteenth Amendment had any effect on the continued validity of that principle. *E. g., Walker* v. *Sauvinet,* 92 U. S. 90; see generally Morrison, Does the Fourteenth Amendment Incorporate the Bill of Rights? The Judicial Interpretation, 2 Stan. L. Rev. 140 (1949).

constitutional straitjacket with respect to their own development in the administration of criminal or civil law.

Although I therefore fundamentally disagree with the total incorporation view of the Fourteenth Amendment, it seems to me that such a position does at least have the virtue, lacking in the Court's selective incorporation approach, of internal consistency: we look to the Bill of Rights, word for word, clause for clause, precedent for precedent because, it is said, the men who wrote the Amendment wanted it that way. For those who do not accept this "history," a different source of "intermediate premises" must be found. The Bill of Rights is not necessarily irrelevant to the search for guidance in interpreting the Fourteenth Amendment, but the reason for and the nature of its relevance must be articulated.

Apart from the approach taken by the absolute incorporationists, I can see only one method of analysis that has any internal logic. That is to start with the words "liberty" and "due process of law" and attempt to define them in a way that accords with American traditions and our system of government. This approach, involving a much more discriminating process of adjudication than does "incorporation," is, albeit difficult, the one that was followed throughout the 19th and most of the present century. It entails a "gradual process of judicial inclusion and exclusion," [10] seeking, with due recognition of constitutional tolerance for state experimentation and disparity, to ascertain those "immutable principles . . . of free government which no member of the Union may disregard." [11] Due process was not restricted to rules fixed in the past, for that "would be to deny every quality

---

[10] *Davidson* v. *New Orleans,* 96 U. S. 97, 104.

[11] *Holden* v. *Hardy,* 169 U. S. 366, 389.

of the law but its age, and to render it incapable of progress or improvement." [12]   Nor did it impose nation-wide uniformity in details, for

> "[t]he Fourteenth Amendment does not profess to secure to all persons in the United States the benefit of the same laws and the same remedies.  Great diversities in these respects may exist in two States separated only by an imaginary line.  On one side of this line there may be a right of trial by jury, and on the other side no such right.  Each State prescribes its own modes of judicial proceeding." [13]

Through this gradual process, this Court sought to define "liberty" by isolating freedoms that Americans of the past and of the present considered more important than any suggested countervailing public objective.  The Court also, by interpretation of the phrase "due process of law," enforced the Constitution's guarantee that no State may imprison an individual except by fair and impartial procedures.

The relationship of the Bill of Rights to this "gradual process" seems to me to be twofold.  In the first place it has long been clear that the Due Process Clause imposes some restrictions on state action that parallel Bill of Rights restrictions on federal action.  Second, and more important than this accidental overlap, is the fact that the Bill of Rights is evidence, at various points, of the content Americans find in the term "liberty" and of American standards of fundamental fairness.

An example, both of the phenomenon of parallelism and the use of the first eight Amendments as evidence of a historic commitment, is found in the partial definition

[12] *Hurtado* v. *California,* 110 U. S. 516, 529.
[13] *Missouri* v. *Lewis,* 101 U. S. 22, 31.

of "liberty" offered by Mr. Justice Holmes, dissenting in *Gitlow* v. *New York,* 268 U. S. 652:

"The general principle of free speech . . . must be taken to be included in the Fourteenth Amendment, in view of the scope that has been given to the word 'liberty' as there used, although perhaps it may be accepted with a somewhat larger latitude of interpretation than is allowed to Congress by the sweeping language that governs or ought to govern the laws of the United States." *Id.,* at 672.

As another example, Mr. Justice Frankfurter, speaking for the Court in *Wolf* v. *Colorado,* 338 U. S. 25, 27–28, recognized that

"[t]he security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society. It is therefore implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause."

The Court has also found among the procedural requirements of "due process of law" certain rules paralleling requirements of the first eight Amendments. For example, in *Powell* v. *Alabama,* 287 U. S. 45, the Court ruled that a State could not deny counsel to an accused in a capital case:

"The fact that the right involved is of such a character that it cannot be denied without violating those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions' . . . is obviously one of those compelling considerations which must prevail in determining whether it is embraced within the due process clause of the Fourteenth Amendment, *although* it be specifically dealt with in another part of the federal Constitution." *Id.,* at 67. (Emphasis added.)

Later, the right to counsel was extended to all felony cases.[14] The Court has also ruled, for example, that "due process" means a speedy process, so that liberty will not be long restricted prior to an adjudication, and evidence of fact will not become stale;[15] that in a system committed to the resolution of issues of fact by adversary proceedings the right to confront opposing witnesses must be guaranteed;[16] and that if issues of fact are tried to a jury, fairness demands a jury impartially selected.[17] That these requirements are fundamental to procedural fairness hardly needs redemonstration.

In all of these instances, the right guaranteed against the States by the Fourteenth Amendment was one that had also been guaranteed against the Federal Government by one of the first eight Amendments. The logically critical thing, however, was not that the rights had been found in the Bill of Rights, but that they were deemed, in the context of American legal history, to be fundamental. This was perhaps best explained by Mr. Justice Cardozo, speaking for a Court that included Chief Justice Hughes and Justices Brandeis and Stone, in *Palko* v. *Connecticut,* 302 U. S. 319:

> "If the Fourteenth Amendment has absorbed them, the process of absorption has had its source in the belief that neither liberty nor justice would exist if they were sacrificed." *Id.,* at 326.

Referring to *Powell* v. *Alabama, supra,* Mr. Justice Cardozo continued:

> "The decision did not turn upon the fact that the benefit of counsel would have been guaranteed to

---

[14] *Gideon* v. *Wainwright,* 372 U. S. 335. The right to counsel was found in the Fourteenth Amendment because, the Court held, it *was* essential to a fair trial. See 372 U. S., at 342–345.

[15] *Klopfer* v. *North Carolina,* 386 U. S. 213.

[16] *Pointer* v. *Texas,* 380 U. S. 400.

[17] *Irvin* v. *Dowd,* 366 U. S. 717.

the defendants by the provisions of the Sixth Amendment if they had been prosecuted in a federal court. The decision turned upon the fact that in the particular situation laid before us in the evidence the benefit of counsel was essential to the substance of a hearing." *Id.,* at 327.

Mr. Justice Cardozo then went on to explain that the Fourteenth Amendment did not impose on each State every rule of procedure that some other State, or the federal courts, thought desirable, but only those rules critical to liberty:

> "The line of division may seem to be wavering and broken if there is a hasty catalogue of the cases on the one side and the other. Reflection and analysis will induce a different view. There emerges the perception of a rationalizing principle which gives to discrete instances a proper order and coherence. The right to trial by jury and the immunity from prosecution except as the result of an indictment may have value and importance. Even so, they are not of the very essence of a scheme of ordered liberty. To abolish them is not to violate a 'principle of justice so rooted in the traditions and conscience of *our people* as to be ranked as fundamental.' . . . Few would be so narrow or provincial as to maintain that a fair and enlightened system of justice would be impossible without them." *Id.,* at 325. (Emphasis added.)

Today's Court still remains unwilling to accept the total incorporationists' view of the history of the Fourteenth Amendment. This, if accepted, would afford a cogent reason for applying the Sixth Amendment to the States. The Court is also, apparently, unwilling to face the task of determining whether denial of trial by jury in the situation before us, or in other situations, is fun-

damentally unfair. Consequently, the Court has compromised on the ease of the incorporationist position, without its internal logic. It has simply assumed that the question before us is whether the Jury Trial Clause of the Sixth Amendment should be incorporated into the Fourteenth, jot-for-jot and case-for-case, or ignored. Then the Court merely declares that the clause in question is "in" rather than "out." [18]

The Court has justified neither its starting place nor its conclusion. If the problem is to discover and articulate the rules of fundamental fairness in criminal proceedings, there is no reason to assume that the whole body of rules developed in this Court constituting Sixth Amendment jury trial must be regarded as a unit. The requirement of trial by jury in federal criminal cases has given rise to numerous subsidiary questions respecting the exact scope and content of the right. It surely cannot be that every answer the Court has given, or will give, to such a question is attributable to the Founders; or even that every rule announced carries equal conviction of this Court; still less can it be that every such subprinciple is equally fundamental to ordered liberty.

Examples abound. I should suppose it obviously fundamental to fairness that a "jury" means an "impartial

---

[18] The same illogical way of dealing with a Fourteenth Amendment problem was employed in *Malloy* v. *Hogan*, 378 U. S. 1, which held that the Due Process Clause guaranteed the protection of the Self-Incrimination Clause of the Fifth Amendment against state action. I disagreed at that time both with the way the question was framed and with the result the Court reached. See my dissenting opinion, *id.*, at 14. I consider myself bound by the Court's holding in *Malloy* with respect to self-incrimination. See my concurring opinion in *Griffin* v. *California*, 380 U. S. 609, 615. I do not think that *Malloy* held, nor would I consider myself bound by a holding, that every question arising under the Due Process Clause shall be settled by an arbitrary decision whether a clause in the Bill of Rights is "in" or "out."

jury." [19]   I should think it equally obvious that the rule, imposed long ago in the federal courts, that "jury" means "jury of exactly twelve," [20] is not fundamental to anything: there is no significance except to mystics in the number 12.   Again, trial by jury has been held to require a unanimous verdict of jurors in the federal courts, [21] although unanimity has not been found essential to liberty in Britain, where the requirement has been abandoned. [22]

One further example is directly relevant here.   The co-existence of a requirement of jury trial in federal criminal cases and a historic and universally recognized exception for "petty crimes" has compelled this Court, on occasion, to decide whether a particular crime is petty, or is included within the guarantee. [23]   Individual cases have been decided without great conviction and without reference to a guiding principle.   The Court today holds, for no discernible reason, that if and when the line is drawn its exact location will be a matter of such fundamental importance that it will be uniformly imposed on the States.   This Court is compelled to decide such

[19] The Court has so held in, *e. g.*, *Irvin* v. *Dowd*, 366 U. S. 717. Compare *Dennis* v. *United States*, 339 U. S. 162.

[20] *E. g.*, *Rassmussen* v. *United States*, 197 U. S. 516.

[21] *E. g.*, *Andres* v. *United States*, 333 U. S. 740.   With respect to the common-law number and unanimity requirements, the Court suggests that these present no problem because "our decisions interpreting the Sixth Amendment are always subject to reconsideration . . . ."   *Ante*, at 158, n. 30.   These examples illustrate a major danger of the "incorporation" approach—that provisions of the Bill of Rights may be watered down in the needless pursuit of uniformity.   Cf. my concurring opinion in *Ker* v. *California*, 374 U. S. 23, 44.   Mr. Justice White alluded to this problem in his dissenting opinion in *Malloy* v. *Hogan, supra*, at 38.

[22] Criminal Justice Act of 1967, § 13.

[23] *E. g.*, *Callan* v. *Wilson*, 127 U. S. 540; *District of Columbia* v. *Clawans*, 300 U. S. 617; *District of Columbia* v. *Colts*, 282 U. S. 63.

obscure borderline questions in the course of administering federal law. This does not mean that its decisions are demonstrably sounder than those that would be reached by state courts and legislatures, let alone that they are of such importance that fairness demands their imposition throughout the Nation.

Even if I could agree that the question before us is whether Sixth Amendment jury trial is totally "in" or totally "out," I can find in the Court's opinion no real reasons for concluding that it should be "in." The basis for differentiating among clauses in the Bill of Rights cannot be that only some clauses are in the Bill of Rights, or that only some are old and much praised, or that only some have played an important role in the development of federal law. These things are true of all. The Court says that some clauses are more "fundamental" than others, but it turns out to be using this word in a sense that would have astonished Mr. Justice Cardozo and which, in addition, is of no help. The word does not mean "analytically critical to procedural fairness" for no real analysis of the role of the jury in making procedures fair is even attempted. Instead, the word turns out to mean "old," "much praised," and "found in the Bill of Rights." The definition of "fundamental" thus turns out to be circular.

II.

Since, as I see it, the Court has not even come to grips with the issues in this case, it is necessary to start from the beginning. When a criminal defendant contends that his state conviction lacked "due process of law," the question before this Court, in my view, is whether he was denied any element of fundamental procedural fairness. Believing, as I do, that due process is an evolving concept and that old principles are subject to re-evaluation in light of later experience, I think it appropriate to deal on its merits with the question whether Louisiana denied

appellant due process of law when it tried him for simple assault without a jury.

The obvious starting place is the fact that this Court has, in the past, *held* that trial by jury is not a requisite of criminal due process. In the leading case, *Maxwell* v. *Dow,* 176 U. S. 581, Mr. Justice Peckham wrote as follows for the Court: [24]

> "Trial by jury has never been affirmed to be a necessary requisite of due process of law. . . .
>
> .        .        .        .        .
>
> ". . . The right to be proceeded against only by indictment, and the right to a trial by twelve jurors, are of the same nature, and are subject to the same judgment, and the people in the several States have the same right to provide by their organic law for the change of both or either. . . . [T]he State has full control over the procedure in its courts, both in civil and criminal cases, subject only to the qualification that such procedure must not work a denial of fundamental rights or conflict with specific and applicable provisions of the Federal Constitution. The legislation in question is not, in our opinion, open to either of these objections." *Id.,* at 603–605.

---

[24] The precise issue in *Maxwell* was whether a jury of eight rather than 12 jurors could be employed in criminal prosecutions in Utah. The Court held that this was permissible because the Fourteenth Amendment did not require the States to provide trial by jury at all. The Court seems to think this was dictum. As a technical matter, however, a statement that is critical to the chain of reasoning by which a result is in fact reached does not become dictum simply because a later court can imagine a totally different way of deciding the case. See *Jordan* v. *Massachusetts,* 225 U. S. 167, 176, citing *Maxwell* for the proposition that "the requirement of due process does not deprive a State of the power to dispense with jury trial altogether."

In *Hawaii* v. *Mankichi,* 190 U. S. 197, the question was whether the Territory of Hawaii could continue its pre-annexation procedure of permitting conviction by non-unanimous juries. The Congressional Resolution of Annexation had provided that municipal legislation of Hawaii that was not contrary to the United States Constitution could remain in force. The Court interpreted the resolution to mean only that those requirements of the Constitution that were "fundamental" would be binding in the Territory. After concluding that a municipal statute allowing a conviction of treason on circumstantial evidence *would* violate a "fundamental" guarantee of the Constitution, the Court continued:

> "We would even go farther, and say that most, if not all, the privileges and immunities contained in the bill of rights of the Constitution were intended to apply from the moment of annexation; but we place our decision of this case upon the ground that the two rights alleged to be violated in this case [Sixth Amendment jury trial and grand jury indictment] are not fundamental in their nature, but concern merely a method of procedure which sixty years of practice had shown to be suited to the conditions of the islands, and well calculated to conserve the rights of their citizens to their lives, their property and their well-being." *Id.,* at 217–218.

Numerous other cases in this Court have assumed that jury trial is not fundamental to ordered liberty.[25]

Although it is of course open to this Court to re-examine these decisions, I can see no reason why they

---

[25] *E. g., Irvin* v. *Dowd, supra,* at 721; *Fay* v. *New York,* 332 U. S. 261, 288; *Palko* v. *Connecticut, supra,* at 325; *Snyder* v. *Massachusetts,* 291 U. S. 97, 105; *Brown* v. *New Jersey,* 175 U. S. 172, 175; *Missouri* v. *Lewis, supra,* at 31.

should now be overturned. It can hardly be said that time has altered the question, or brought significant new evidence to bear upon it. The virtues and defects of the jury system have been hotly debated for a long time,[26] and are hotly debated today, without significant change in the lines of argument.[27]

The argument that jury trial is not a requisite of due process is quite simple. The central proposition of *Palko, supra,* a proposition to which I would adhere, is that "due process of law" requires only that criminal trials be fundamentally fair. As stated above, apart from the theory that it was historically intended as a mere shorthand for the Bill of Rights, I do not see what else "due process of law" can intelligibly be thought to mean. If due process of law requires only fundamental

---

[26] *E. g.,* Deady, Trial by Jury, 17 Am. L. Rev. 398, 399–400 (1883):

"Still in these days of progress and experiment, when everything is on trial at the bar of human reason or conceit, it is quite the fashion to speak of jury trial as something that has outlived its usefulness. Intelligent and well-meaning people often sneer at it as an awkward and useless impediment to the speedy and correct administration of justice, and a convenient loop-hole for the escape of powerful and popular rogues. Considering the kind of jury trials we sometimes have in the United States, it must be admitted that this criticism is not without foundation."

[27] See generally Kalven, Memorandum Regarding Jury System, printed in Hearings on Recording of Jury Deliberations before the Subcommittee to Investigate the Administration of the Internal Security Act of the Senate Committee on the Judiciary, 84th Cong., 1st Sess., 63–81. In particular,

"the debate has been going on for a long time (at least since 1780) and the arguments which were advanced pro and con haven't changed much in the interim. Nor, contrary to my first impression, does there seem to be any particular period in which the debate grows hotter or colder. It has always been a hot debate." *Id.,* at 63.

fairness,[28] then the inquiry in each case must be whether a state trial process was a fair one. The Court has held, properly I think, that in an adversary process it is a requisite of fairness, for which there is no adequate substitute, that a criminal defendant be afforded a right to counsel and to cross-examine opposing witnesses. But it simply has not been demonstrated, nor, I think, can it be demonstrated, that trial by jury is the only fair means of resolving issues of fact.

The jury is of course not without virtues. It affords ordinary citizens a valuable opportunity to participate in a process of government, an experience fostering, one hopes, a respect for law.[29] It eases the burden on judges by enabling them to share a part of their sometimes awesome responsibility.[30] A jury may, at times, afford a higher justice by refusing to enforce harsh laws (although it necessarily does so haphazardly, raising the questions whether arbitrary enforcement of harsh laws is better than total enforcement, and whether the jury system is to be defended on the ground that jurors sometimes disobey their oaths).[31] And the jury may, or may

---

[28] See, *e. g., Snyder* v. *Massachusetts, supra,* at 107–108 (Cardozo, J.) :

"So far as the Fourteenth Amendment is concerned, the presence of a defendant [at trial] is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only."

[29] The point is made by, among others, A. Tocqueville. 1 Democracy in America 285 (Reeve tr.).

[30] The argument is developed by Curtis, The Trial Judge and the Jury, 5 Vand. L. Rev. 150 (1952). For example,

"Juries relieve the judge of the embarrassment of making the necessary exceptions. They do this, it is true, by violating their oaths, but this, I think, is better than tempting the judge to violate his oath of office." *Id.,* at 157.

[31] See generally G. Williams, The Proof of Guilt 257–263; W. Forsyth, History of Trial by Jury 261.

not, contribute desirably to the willingness of the general public to accept criminal judgments as just.[32]

It can hardly be gainsaid, however, that the principal original virtue of the jury trial—the limitations a jury imposes on a tyrannous judiciary—has largely disappeared. We no longer live in a medieval or colonial society. Judges enforce laws enacted by democratic decision, not by regal fiat. They are elected by the people or appointed by the people's elected officials, and are responsible not to a distant monarch alone but to reviewing courts, including this one.[33]

The jury system can also be said to have some inherent defects, which are multiplied by the emergence of the criminal law from the relative simplicity that existed when the jury system was devised.[34] It is a cumbersome process, not only imposing great cost in time and money on both the State and the jurors themselves,[35] but also contributing to delay in the machinery of justice.[36] Untrained jurors are presumably less adept at reaching accurate conclusions of fact than judges,

---

[32] See J. Stephen, A General View of the Criminal Law of England 208–209.

[33] See, *e. g.*, Sunderland, The Inefficiency of the American Jury, 13 Mich. L. Rev. 302, 305:

"But times have changed, and the government itself is now under the absolute control of the people. The judges, if appointed, are selected by the agents of the people, and if elected are selected by the people directly. The need for the jury as a political weapon of defense has been steadily diminishing for a hundred years, until now the jury must find some other justification for its continuance."

[34] See, *e. g.*, Sunderland, *supra*, at 303:

"Life was simple when the jury system was young, but with the steadily growing complexity of society and social practices, the facts which enter into legal controversies have become much more complex."

[35] Compare Green, Jury Injustice, 20 Jurid. Rev. 132, 133.

[36] Cf. Lummus, Civil Juries and the Law's Delay, 12 B. U. L. Rev. 487.

particularly if the issues are many or complex.[37]   And it is argued by some that trial by jury, far from increasing public respect for law, impairs it: the average man, it is said, reacts favorably neither to the notion that matters he knows to be complex are being decided by other average men,[38] nor to the way the jury system distorts the process of adjudication.[39]

That trial by jury is not the only fair way of adjudicating criminal guilt is well attested by the fact that it is not the prevailing way, either in England or in this country.   For England, one expert makes the following estimates.   Parliament generally provides that new statutory offenses, unless they are of "considerable gravity" shall be tried to judges; consequently, summary offenses now outnumber offenses for which jury trial is afforded by more than six to one.   Then, within the latter category, 84% of all cases are in fact tried to the court.   Over all, "the ratio of defendants actually tried by jury becomes in some years little more than 1 per cent." [40]

---

[37] See, *e. g.*, McWhorter, Abolish the Jury, 57 Am. L. Rev. 42. Statistics on this point are difficult to accumulate for the reason that the only way to measure jury performance is to compare the result reached by a jury with the result the judge would have reached in the same case.   While judge-jury comparisons have many values, it is impossible to obtain a statistical comparison of accuracy in this manner.   See generally H. Kalven & H. Zeisel, The American Jury, *passim*.

[38] *E. g.*, Boston, Some Practical Remedies for Existing Defects in the Administration of Justice, 61 U. Pa. L. Rev. 1, 16:

"There is not one important personal or property interest, outside of a Court of justice, which any of us would willingly commit to the first twelve men that come along the street . . . ."

[39] *E. g.*, McWhorter, *supra*, at 46:

"It is the jury system that consumes time at the public expense in gallery playing and sensational and theatrical exhibitions before the jury, whereby the public interest and the dignity of the law are swallowed up in a morbid, partisan or emotional personal interest in the parties immediately concerned."

[40] Williams, *supra*, at 302.

In the United States, where it has not been as generally assumed that jury waiver is permissible,[41] the statistics are only slightly less revealing. Two experts have estimated that, of all prosecutions for crimes triable to a jury, 75% are settled by guilty plea and 40% of the remainder are tried to the court.[42] In one State, Maryland, which has always provided for waiver, the rate of court trial appears in some years to have reached 90%.[43] The Court recognizes the force of these statistics in stating,

> "We would not assert, however, that every criminal trial—or any particular trial—held before a judge alone is unfair or that a defendant may never be as fairly treated by a judge as he would be by a jury." *Ante,* at 158.

I agree. I therefore see no reason why this Court should reverse the conviction of appellant, absent any suggestion that his particular trial was in fact unfair, or compel the State of Louisiana to afford jury trial in an as yet unbounded category of cases that can, without unfairness, be tried to a court.

Indeed, even if I were persuaded that trial by jury is a fundamental right in some criminal cases, I could see nothing fundamental in the rule, not yet formulated by the Court, that places the prosecution of appellant for simple battery within the category of "jury crimes" rather than "petty crimes." Trial by jury is ancient,

---

[41] For example, in the federal courts the right of the defendant to waive a jury was in doubt as recently as 1930, when it was established in *Patton* v. *United States,* 281 U. S. 276. It was settled in New York only in 1957, *People* v. *Carroll,* 7 Misc. 2d 581, 161 N. Y. S. 2d 339, aff'd, 3 N. Y. 2d 686, 148 N. E. 2d 875.

[42] Kalven & Zeisel, *supra,* at 12–32.

[43] See Oppenheim, Waiver of Trial by Jury in Criminal Cases, 25 Mich. L. Rev. 695, 728.

it is true. Almost equally ancient, however, is the discovery that, because of it,

> "the King's most loving Subjects are much travailed and otherwise encumbered in coming and keeping of the said six Weeks Sessions, to their Costs, Charges, Unquietness." [44]

As a result, through the long course of British and American history, summary procedures have been used in a varying category of lesser crimes as a flexible response to the burden jury trial would otherwise impose.

The use of summary procedures has long been widespread. British procedure in 1776 exempted from the requirement of jury trial

> "[v]iolations of the laws relating to liquor, trade and manufacture, labor, smuggling, traffic on the highway, the Sabbath, 'cheats,' gambling, swearing, small thefts, *assaults,* offenses to property, servants and seamen, vagabondage . . . [and] at least a hundred more . . . ." [45]   (Emphasis added.)

Penalties for such offenses included heavy fines (with imprisonment until they were paid), whippings, and imprisonment at hard labor.[46]

Nor had the Colonies a cleaner slate, although practices varied greatly from place to place with conditions. In Massachusetts, crimes punishable by whipping (up to 10 strokes), the stocks (up to three hours), the ducking stool, and fines and imprisonment were triable to magistrates.[47]   The decision of a magistrate could, in theory,

---

[44] 37 Hen. 8, c. 7.

[45] Frankfurter & Corcoran, Petty Federal Offenses and the Constitutional Guaranty of Trial by Jury, 39 Harv. L. Rev. 917, 928. The source of the authors' information is R. Burn, Justice of the Peace (1776).

[46] Frankfurter & Corcoran, *supra,* at 930–934.

[47] See, *id.,* at 938–942.

be appealed to a jury, but a stiff recognizance made exercise of this right quite rare.[48]   New York was somewhat harsher.   For example, "anyone adjudged by two magistrates to be an idle, disorderly or vagrant person might be transported whence he came, and on reappearance be whipped from constable to constable with thirty-one lashes by each." [49]   Anyone committing a criminal offense "under the degree of Grand Larceny" and unable to furnish bail within 48 hours could be summarily tried by three justices.[50]   With local variations, examples could be multiplied.

The point is not that many offenses that English-speaking communities have, at one time or another, regarded as triable without a jury are more serious, and carry more serious penalties, than the one involved here. The point is rather that until today few people would have thought the exact location of the line mattered very much.   There is no obvious reason why a jury trial is a requisite of fundamental fairness when the charge is robbery, and not a requisite of fairness when the same defendant, for the same actions, is charged with assault and petty theft.[51]   The reason for the historic exception for relatively minor crimes is the obvious one: the burden of jury trial was thought to outweigh its marginal advantages.   Exactly why the States should not be allowed to make continuing adjustments, based on the state of

[48] *Ibid.*

[49] Frankfurter & Corcoran, *supra,* at 945.   They refer to the Vagrancy Act of 1721, 2 Col. L. (N. Y.) 56.

[50] Frankfurter & Corcoran, *supra,* at 945.

[51] The example is taken from Day, Petty Magistrates' Courts in Connecticut, 17 J. Crim. L. C. & P. S., 343, 346–347, cited in Kalven & Zeisel, *supra,* at 17.   The point is that the "huge proportion" of criminal charges for which jury trial has not been available in America, E. Puttkammer, Administration of Criminal Law 87–88, is increased by the judicious action of weary prosecutors.

their criminal dockets and the difficulty of summoning jurors, simply escapes me.

In sum, there is a wide range of views on the desirability of trial by jury, and on the ways to make it most effective when it is used; there is also considerable variation from State to State in local conditions such as the size of the criminal caseload, the ease or difficulty of summoning jurors, and other trial conditions bearing on fairness. We have before us, therefore, an almost perfect example of a situation in which the celebrated dictum of Mr. Justice Brandeis should be invoked. It is, he said,

> "one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory . . . ." *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 280, 311 (dissenting opinion).

This Court, other courts, and the political process are available to correct any experiments in criminal procedure that prove fundamentally unfair to defendants. That is not what is being done today: instead, and quite without reason, the Court has chosen to impose upon every State one means of trying criminal cases; it is a good means, but it is not the only fair means, and it is not demonstrably better than the alternatives States might devise.

I would affirm the judgment of the Supreme Court of Louisiana.