Burke, J. (dissenting).
The majority today concludes that a defendant who is exposed to a maximum of one year’s imprisonment is not entitled to the opportunity for trial by jury. Because that conclusion is not supported by a fair reading of the United States Supreme Court’s decision in Duncan v. Louisiana (391 U. S. 145), and because the States have an affirmative obligation to safeguard Federal constitutional rights (Sims v. Georgia, 385 U. S. 538, 544; South Carolina v. Bailey, 289 U. S. 412, 420), I must respectfully dissent and indicate, by a complete and objective analysis of the rationale of Duncan, that defendants Baldwin and Puryear and all others charged with the commission of class A misdemeanors are entitled to a jury trial because such crimes are ‘ ‘ serious ’ ’ within the meaning of that term as used in Duncan. The majority opinion begins by concluding that Duncan is not “ dispositive ” of the present cases. To the extent that Duncan 'did not, in so many words, hold that a one-year maximum sentence requires a jury trial, it is not, to that extent, “ dispositive ”. However, adjudications concerning fundamental constitutional rights cannot be premised upon such a narrowly literal approach, but must rather employ an analysis based upon the principles which underlie and give meaning to narrow holdings. Thus, in Duncan, it is clear that the precise holding was limited to a determination that a crime punishable by a maximum of two years’ imprisonment is a serious crime and not a petty offense and that, therefore, due process requires that the defendant charged with such a crime must be accorded the opportunity for a jury trial (391 U. S., p. 161-162). But it is equally clear that that conclusion was but the end result of a process of analysis and the decision is constitutionally significant precisely because its process of analysis provides the basis for subsequent adjudication of cases as to which its precise holding is not “ dispositive.” The Duncan opinion itself recognized this proposition when it pointed out that “ the definitional task necessarily falls on the courts, which must either pass upon the validity of legislative attempts to identify these petty offenses which are exempt from jury trial or, where the legislature has not addressed itself to the problem, themselves face the question in the first instance.” (391 U. S., p. 160.)
*223 The elements of the analytical process were clearly set forth in Duncan, as is clear from the majority’s lengthy quotation from the opinion (opn., pp. 212-213). The court specified that, “ In determining whether the length of the authorized prison term or the seriousness of other punishment is enough in itself to require a jury trial,” reference should be made to “ objective criteria, chiefly the existing laws and practices in the Nation.” (391 U. S., p. 161; emphasis added.) The majority, however, prefers for obvious reasons to refer only to the existing and past laws and practices in this State, obviously a frame of reference at least a bit narrower than referring to “ existing laws and practices in the Nation. ’ ’[1] When reference is had in accord with the Duncan standard, it is clear that the existing laws and practices in the Nation indicate that a one-year maximum sentence of imprisonment is sufficient to make a crime “ serious ” so as to require that a defendant exposed to such a sentence be accorded a right to trial by jury. Congress has expressly rejected a simplistic felony-misdemeanor classification as the determinative factor in distinguishing between “ serious ” and “ petty ” offenses:
“ (1) Any offense punishable by death or imprisonment for a term exceeding one year is a felony.
“ (2) Amy other offense is a misdemeanor.
“ (3) Any misdemeanor, the penalty for which does not exceed imprisonment for a period of six months or a fine of not more than $500, or both, is a petty offense.” (U. S. Code, tit. 18, § 1; emphasis added.) It is, therefore, -clear that the existing Federal law recognizes that, although not all misdemeanors are “ serious ” crimes, misdemeanors punishable by imprisonment in excess of six months are beyond the ‘[1] petty ’ ’ category. (391 IT. S., p. 161.) Existing State laws and practices in the Nation similarly indicate that crimes punishable by up to one year -in prison are not considered “ petty ” for purposes of the right to jury trial. As the opinion in Duncan noted, in 49 *224 of the 50 States crimes subject to trial without a jury are punishable by a maximum one-year term and, in fact, “ there appear to be only two instances, aside from the Louisiana scheme, in which a State denies jury trial for a crime punishable by imprisonment for longer than six months.” (391 TJ. S., p. 161, n. 33.) Indeed, those two instances have since been reduced to one: the denial of trial by jury in New York City for crimes punishable by imprisonment for up to one year. The other instance noted by the court in Duncan was New Jersey’s disorderly conduct offense which, prior to a recent legislative reduction of the maximum sentence to six months (N. J. Stat., Ann., § 2A:169-4, as amd. by N. J. L. 1968> eh. 113), carried a maximum penalty of one year and could be imposed upon conviction without a right to trial by jury. At present, then, the law of 49% States (New York City comprising roughly the other half of the State of New York in terms of population) and the Federal law provide a clear-cut answer as to what maximum term of imprisonment indicates the line of demarcation between ‘ ‘ petty ’ ’ and “ serious ” crimes and the law as to New York City is clearly not in accord with that line of demarcation. Thus, although Duncan is not “ dispositive ” of the present issue in the sense that it did not squarely decide the status of such a one-year maximum, its rationale amply demonstrates that, tested by the proper criteria, such a maximum sentence is characteristic of a “ serious ” crime to the trial of which the right to a jury trial attaches. Should further evidence of that proposition be needed, the internal references in the Duncan opinion supply it. At the very point in the opinion at which the court noted that “ there is a category of petty crimes or offenses which is not subject to the Sixth Amendment jury trial provision and should not be subject to the Fourteenth Amendment jury trial requirement here applied to the States ” (391 U. S., p. 159), it cited in a footnote (ibid., n. 31) to a series of prior Supreme Court cases dealing with the constitutional right to a trial by jury (District of Columbia v. Clawans, 300 U. S. 617; Shick v. United States, 195 U. S. 65; Natal v. Louisiana, 139 U. S. 621; Callan v. Wilson, 127 U. S. 540). In none of those cases idid the court hold that an offense punishable by a term of imprisonment in excess of six months was a petty offense. In addition, in Cheff v. Schnackenberg (384 U. S. 373), the court held that an actual sentence *225 of six months ’ imprisonment for criminal contempt, an offense for which no maximum penalty had been provided, was indicative of a ‘[1] petty ’ ’ offense and, therefore, did not require a right to trial by jury. Moreover, in the exercise of its supervisory power over the Federal courts, the court ruled that “ sentences exceeding six months for criminal contempt may not be imposed by federal courts absent a jury trial or waiver thereof ” (384 IT. S., p. 380; emphasis added), thereby expressing its judgment as to the term of imprisonment at which an offense ceases to be petty enough to be tried without a jury trial right. In the face of all those indications as to the proper resolution of the issue in this case, the majority nevertheless reaches a different conclusion by reference to different criteria.
However, tested even by the criteria chosen by the majority, i.e., the traditional and present practices of the State of New York, the conclusion that a maximum sentence of imprisonment of one year provides the line of demarcation between “ serious ” and “ petty ” crimes cannot be sustained. There is no equation in the law of this State between the ‘ ‘ felony-misdemeanor ’ ’ dichotomy and the dichotomy between ‘ ‘ serious ’ ’ and ‘ ‘ petty ’ ’ offenses. The reliance upon this dichotomy alone, after the enactment of the new Penal Law in 1967, necessarily dismisses as without significance the legislative classification of ‘ ‘ violations ” and the subclassifications of “ felonies ” and “ misdemeanors ”. Without relying on such additional classifications as determinative, it is sufficient to note that an argument can be made with some force that the Legislature has identified petty offenses as those included in the “ violations ” category and in the category of class B misdemeanors. Even more interesting is the statement that a felony conviction results in ‘ ‘ very serious collateral consequences ”, while a misdemeanor conviction results in “ certain collateral consequences ” which “ are not of such a nature as to render these crimes serious ’ ’ (opn., pp. 215,216). The mere fact that the collateral consequences of a felony are dubbed 11 very serious ’ ’ does not, without demonstration, indicate that the collateral consequences of a misdemeanor conviction are not also serious. Indeed, the brief of the District Attorney in Matter of Hogan v. Rosenberg candidly appends a long list of the consequences which may or must flow from a misdemeanor conviction and the great majority of them limit *226 or prevent the convicted misdemeanant’s engaging in various occupations. (iSee, e.g., Insurance Law, § 331; Code Grim. Pro., § 554-b; Education Law, §§ 6514, 7108; Civil Service Law, § 50, subd. 4; Judiciary Law, § 504, subd. 6; § 596, subd. 4; § 662, subd. 4; General Business Law, § 74, subd. 2; Penal Law, § 400.00; Waterfront Commission Compact [L. 1953, ch. 882, § 1, as amd.], art. V, § 3, subd. [b]; § 7, subd. [a]; art. VI, § 3, subd. [e]; § 6, subd. [a]; art. X, § 3, subd. [b]; § 6, subd. [a]; Waterfront Commission Act [L. 1953, ch. 882, § 2, as amd.], § 5-i, subd. 1; § 5-n, subd. 3, par. [b]; § 8; Administrative Code of City of New York, § B-32-10.0 et seq.) While the loss of the right to vote or to hold public office is undoubtedly “very serious,” it is somewhat difficult realistically to say that the restriction or prohibition of an individual’s ability to find gainful employment is not also “ serious ” (if not also “ very serious ”). In sum, there has been no such clear-cut distinction drawn in this State between the consequences flowing from convictions for felonies and convictions for misdemeanors as would justify thé conclusion that the latter are not “ serious ” crimes for purposes of a right to a jury trial. If it is true, as the majority suggests (opn., pp. 214-216), that the 11 maximum penalty authorized in the State of New York for a particular crime is not merely a gauge of how the people of our State view that crime, but necessarily answers the question of whether in their judgment it is petty or serious ”, it is difficult to understand how that judgment is reflected in statutes (UCCA, § 2011; UDCA, § 2011) providing for the right to a trial by jury, outside New York City, for crimes which the majority has concluded they deem to be only “ petty.” Have the people of this State, through their elected representatives, decided that class A misdemeanors are “ serious ” when committed in Syracuse or Rochester but that these same misdemeanors are only “ petty ” when committed in one of the five boroughs of New York City? Is it reasonable to suppose that the people of this State have made a judgment that lines on a map have some mysterious power to transform the “ serious ” into the “ petty ” and vice versa? To say the least, it is to be doubted. Thus, reliance on a so-called public gauge of what is ‘ ‘ serious ’ ’ and what is ‘ ‘ petty ’ ’ leads, in fact, to a conclusion opposite to that reached by the majority since that “public *227 gauge ’ ’, expressed as it is in reference to the entire State except New York City, indicates that misdemeanors generally (and not just class A misdemeanors) are serious enough to require a jury trial. It should also be noted that the recent Constitutional Convention resulted in a proposed revision of the provision relating to the right to a jury trial which would have accorded that right, after January 1, 1970, to all defendants tried for offenses punishable by a term of imprisonment of more than six months. (Proposed Constitution, art. I, § 7, subd. b.) Thus, the most recent expression of the judgment of the people of this State, through their elected delegates, is directly contrary to the judgment attributed to them by the majority. Accordingly, whether tested by the proper national criteria indicated by Duncan or tested by the narrower New York criteria preferred by the majority, the conclusion is clear that a defendant charged with the commission of a class A misdemeanor is entitled to a jury trial since the authorized sentence indicates that such a defendant is being tried for a “ serious ” crime. To the extent that section 40 of the New York City Criminal Court Act denies such a defendant the opportunity for a jury trial, it must be deemed unconstitutional and defendant Baldwin’s conviction should be reversed and his case remitted to that court (the same conclusion applies to respondent Puryear in Matter of Hogan v. Rosenberg since he, too, was charged with the commission of class A misdemeanors).
In the companion case, Matter of Hogan v. Rosenberg, there is also a different and additional reason why the respondent Puryear is entitled to a jury trial. As a person between the ages of 16 and 21, Puryear was exposed, upon conviction, to treatment as a young adult (Penal Law, art. 75) and was, therefore, exposed to the possible imposition of a four-year reformatory sentence. Such an authorized maximum sentence clearly falls within the “ serious ” category defined by Duncan as mandating a right to jury trial unless the characterization of the place of incarceration as a “ reformatory ’ ’ somehow decreases the severity of such a sentence. In determining whether that characterization has such an effect, it is important to recognize certain propositions which indisputably apply to reformatory sentences. First, section 75.00 (subd. 2) of the Penal Law, by its terms, provides for a sentence for a crim^which may be used *228 in place of the ordinary sentence for that crime. Furthermore, the same section provides that such a sentence shall be of unspecified duration and that the court shall not set either a minimum or a maximum term. Section 75.10 provides that the term of such a sentence begins when the young adult is received by the appropriate institution and terminates either upon discharge by the Parole Board or upon 'completion of the maximum term.[2] Furthermore, there is nothing in article 75 of the Penal Law to prevent a court from using a reformatory sentence simply to impose a more severe penalty on a young adult defendant even though it may be clear that he is incapable of being benefited by reformatory commitment (cf. Correction Law, former art. 7-A, § 203 ; People v. Wilson, 17 N Y 2d 40, 45). In sum, then, article 75 of the Penal Law provides for a true penal sentence of indeterminate duration up to a maximum of four years which is applicable only upon conviction of a young adult for a crime. The District Attorney and the Attorney-General argue, however, that the rehabilitative purposes of a reformatory sentence take it out of the category of criminal sentencing and, therefore, remove it from the coverage of Duncan. The argument is unavailing on both constitutional and purely practical grounds especially in view of the unequivocal rejection of such an argument in the juvenile delinquency context of Matter of Gault (387 U. S. 1, 27): “It is of no constitutional consequence — and of little practical meaning — that the institution to which he is committed is called an Industrial School [or ‘Reformatory’].” As the majority notes, the rationale of the Gault decision is equally applicable to reformatory sentences in New York and the length of such sentences requires that defendants subject to such sentences be afforded the right to a jury trial, as mandated by Duncan. As in People v. Baldwin, it is section 40 of the New York City Criminal Court Act which presently denies such a defendant a jury trial. It, therefore, follows that that section, as the locus of unconstitutionality under Duncan, must to that extent be struck down (and that is so in the present case even if the one-year maximum sentence for a class A misdemeanor is not sufficient *229 to constitute it a “ serious ” crime for purposes of a right to trial by jury). The majority, however, inexplicably declares section 40 constitutional, but actually invalidates article 75 sentences in the New York City Criminal Court. While it is sound judicial policy to go to great lengths to save a legislative act from unconstitutionality, it is a questionable implementation of that policy to attempt to save a patently defective bit of legislation by emasculating a different and constitutionally sound legislative act. Article 75 of the Penal Law is a substantive provision which merely provides for a sentence which a court may impose upon a particular class of defendants upon conviction for a crime and which does not in any. way purport to deal with the procedural incidents of a trial for criminal acts. No party to these appeals has raised any challenge to the constitutionality of article 75 and the majority states no ground upon which to declare it invalid or unusable in the City of New York, while apparently sustaining its use elsewhere in the State. The remedy for the constitutional infirmity presently contained in section 40 of the New York City Griminal Court Act is to excise it by holding that jury trials must be accorded to young adult defendants subject to reformatory sentences. The attempt to remedy it by preventing the use of a device made available by legislative enactment, within the power of the Legislature to enact, is to engage in unwarranted judicial legislation. What the majority holding in effect does is to amend article 75 to say that reformatory sentences may be imposed upon young adults convicted of crimes anywhere in the State except as to such you/ng adults as happen to be tried for crimes and are convicted in the Criminal Court of the City of New York. Amendment of legislation is quite clearly a function of the Legislature, the body chosen by and immediately responsible to the people of this State for the exercise of its judgment as to the substantive penalties to be visited upon persons convicted of crimes. The fact that the Constitution has been construed to require that certain procedural rights must be accorded to a defendant subject to the application of a particular substantive provision (such as a reformatory sentence) in no way impugns the validity or wisdom of that substantive provision. Thus, the mere fact that Duncan and Gault, when read together, require that a young adult subject to the imposition of a reformatory sentence be *230 accorded the right to a jury trial in no way affects the validity of the statute authorizing the sentence itself. It simply means that the procedural provision preventing such a trial, in this case section 40 of the Criminal Court Act, is to that extent invalid and must be disregarded. Whether or not, in light of the jury trial requirement here recognized even by the majority, reformatory sentences should continue to be authorizd is a matter for the Legislature and courts, lacking as they are the benefits peculiar to the legislative process, cannot properly make such a determination. Accordingly, the order below dismissing the petition for a writ of prohibition to prevent Puryear’s trial by jury should be affirmed upon the ground that section 40 of the New York City Criminal Court Act, insofar as it denies him a jury trial, is unconstitutional. Furthermore, it should be pointed out that such a holding in no way limits or prevents the imposition of reformatory sentences in that court, but merely requires that a young adult exposed to such a sentence be accorded a right to trial by jury.
Finally, the majority concludes that the statutory denial of a jury trial for misdemeanants tried in New York City does not violate the equal protection clause of the Fourteenth Amendment even though a jury trial is accorded by statute to defendants charged with identical misdemeanors elsewhere in the State. (Compare N. Y. City Crim. Ct. Act, § 40, with UOCA, § 2011, and TJDCA, § 2011.) With this conclusion I cannot agree even though I recognize that precedent such as Salsburg v. Maryland (346 U. S. 545 [1954]) would apparently sustain the majority’s position. Salsburg’s holding, however, has been undercut at least somewhat by the subsequent decision in Mapp v. Ohio (367 U. S. 643; see Hall v. St. Helena Parish School Bd., 197 F. Supp. 649, 658 [1961]) and the decision in Missouri v. Lewis (101 U. S. 22) is readily distinguishable in that Missouri had provided for appeals (the procedural right at issue in that case) throughout the State and had merely provided a different appellate court for appeals from circuit courts in the city of St. Louis and adjoining counties. That decision would be support for the majority’s conclusion if Missouri had denied appeals from St. Louis courts while providing for them from courts in all other parts of the State of Missouri. That this was the case is apparent from the Lewis opinion itself where the court pointed out *231 that the appellant 1‘ Bowman has had the benefit of the right to appeal to the full extent enjoyed by any other member of the profession in other parts of the State.” (101 U. S., p. 33.) It is clear here that Baldwin and Puryear have not had and will not have, under the majority’s holding, the benefit of a right to jury trial to the full extent enjoyed by any other misdemeanant in other parts of New York State. Lewis, therefore, was a case in which there was no discrimination and its broad dicta as to the constitutionality of territorial discrimination within a State should be regarded as precisely that. As to the current weight of such dicta in cases involving constitutional rights, it should be noted that the court in Duncan rather easily rejected the dicta in Maxwell v. Dow (176 U. S. 581) to the effect that the States could constitutionally abolish jury trials entirely. Furthermore, the viability of territorial .discrimination in terms of the equal protection clause is not beyond question in light of its treatment in the recent reapportionment cases (Baker v. Carr, 369 U. S. 186; Reynolds v. Sims, 377 U. S. 533). With specific reference to equal protection in the context of the criminal law, the Supreme Court has stated that “ [b]oth equal protection and due process emphasize the central aim of our judicial system—all people charged with crime must, so far as the law is concerned, ‘ stand on an equality before the bar of justice in every American court. ’ ” (Griffin v. Illinois, 351 U. S. 12, 17; emphasis added.) Similarly, in Baxstrom v. Her old (383 IT. S. 107), that court held that it was a denial of the equal protection of the laws to deny a jury trial on the issue of the mental status of a defendant nearing the end of a criminal sentence when such a jury trial was accorded to all others civilly committed: “ It follows that the State, having made this substantial review proceeding generally available on this issue, may not, consistent with the Equal Protection Clause of the Fourteenth Amendment, arbitrarily withhold it from some.” (383 IT. S., p. Ill; emphasis added.) In the present case, the State of New York, having made jury trials generally available for misdemeanors, cannot, consistent with the equal protection clause of the Fourteenth Amendment, withhold it from some defendants because of the purely fortuitous circumstance that they are tried in New York City rather than in Buffalo, Syracuse or any other locality outside the City of New York. The *232 discrimination which is evident in the present New York scheme ‘ ‘ cannot be whistled down the wind with the statement that court business must go on, that dockets must be cleared, or that the requirements of jury service should not be expanded to the loss of the citizen in his private affairs.” (Clawans v. District of Columbia, 84 F. 2d 265, 269, affd. on other grounds 300 U. S. 617.) Accordingly, both Baldwin and Puryear are also entitled to a jury trial since the denial of that right to them constitutes a denial of the equal protection of the laws guaranteed by the Fourteenth Amendment. It should also be noted that the majority’s holding in preventing the use of reformatory sentences in the Criminal Court of the City of New York, in addition to constituting unwarranted judicial legislation, involves an invidious discrimination against young adults tried in that court in violation of the equal protection clause of the Fourteenth Amendment. In effect, the majority would impose such an invidious discrimination, a 'discrimination which the Legislature has not made, precisely because the court recognizes that, without such discrimination, such young adults would have jury trials pursuant to the due process clause. It is ironic indeed that a finding that such persons are entitled to one constitutional right results in their being deprived of another and equally valuable constitutional right. The circle thus resulting is both vicious and unnecessary and simply underlines the simplicity and reasonableness of the indicated result, i.e., that such young adults should be accorded the right to a jury trial, at the conclusion of which (assuming a conviction) the discretionary reformatory sentence, as authorized by the Legislature, could be imposed.
Accordingly, in People v. Baldwin the judgment appealed from should be reversed. In Matter of Hogan v. Rosenberg the judgment dismissing the petition for a writ of prohibition should be affirmed.
In Matter of Hogan v. Rosenberg:
Chief Judge Full and Judges Bergan, Bkeitel and Jasen concur with Judge Scileppi- Judge Burke dissents and votes to affirm in an opinion in which Judge Keating concurs.
Judgment reversed, without costs, and matter remitted to Special Term for further proceedings in accordance with the opinion herein.
*233 In People v. Baldwin:
Chief Judge Fuld and Judges Bergan, Breitel and Jasen concur with Judge Scileppi; Judge Burke dissents and votes to reverse in an opinion in which Judge Keating concurs.
Judgment affirmed.

. It should be noted that, had this narrower reference been used in the Duncan ease itself, Louisiana could undoubtedly have shown that its people had demonstrated their view of the pettiness of “ simple battery ” by their longstanding denial of jury trial for such a crime in the Louisiana 'Constitution, even though such crime carried a maximum penalty of two years’ imprisonment.

. The possibility of earlier discharge "by the Parole Board is insufficient to change the character of the sentence since, under Duncan, the maximum authorized sentence, and not the sentence actually imposed or served, is the relevant factor in the determination as to whether the defendant is entitled to a jury trial.