865 F.2d 1267
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Melvin DANIELS, Petitioner-Appellant,
v.
Arthur TATE, Superintendent, Respondent-Appellee.
 No. 87-4149.
 United States Court of Appeals, Sixth Circuit.
 Jan. 17, 1989.
 
 Before KEITH and KRUPANSKY, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Petitioner, Melvin Daniels ("Daniels"), an inmate in state custody at the Chillicothe Correctional Institute, appeals from the order and judgment of the district court denying his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. Sec. 2254. For the reasons set forth below, we AFFIRM.
 
 I.
 
 2
 On September 5, 1975, Daniels was indicted by the Hamilton County Grand Jury on two counts of kidnapping in violation of Ohio Revised Code Ann. Sec. 2905.01 and two counts of rape in violation of Ohio Revised Code Ann. Sec. 2907.02. Daniels, a black man, was charged with kidnapping and raping two white women, Kim McHenry and Joy Clark. After waiving his right to trial by jury, Daniels was found guilty as charged by the Hamilton County Court of Common Pleas.
 
 
 3
 On appeal, Daniels contended that the state trial court erred by admitting the victims' in-court identification testimony. Daniels argued that the victims' in-court identification was tainted because they had previously made an out-of-court identification of him in the absence of his counsel. Rejecting Daniels' contentions, the Ohio Court of Appeals affirmed the judgment of conviction against him on August 17, 1977. The Ohio Supreme Court denied leave to appeal on November 25, 1977.
 
 
 4
 Daniels subsequently filed a petition for a writ of habeas corpus in federal court and again alleged that the state trial court erred in admitting the victims' in-court identification testimony. Daniel's petition was denied. See Daniels v. Jago, No. C-1-79-102, slip op. (S.D.Ohio Jan. 7, 1980), aff'd, 627 F.2d 1089 (6th Cir.), cert. denied, 449 U.S. 985 (1980).
 
 
 5
 On September 3, 1980, Daniels filed a petition to vacate his sentence with the Hamilton County Court of Common Pleas pursuant to Ohio Revised Code Ann. Sec. 2953.21. To support his petition, Daniels essentially argued that he had been denied effective assistance of counsel in the original state court trial. After a hearing, the Hamilton County Court dismissed Daniels' petition on February 10, 1982. The Ohio Court of Appeals affirmed the trial court decision on October 5, 1983. The Ohio Supreme Court denied leave to appeal on September 12, 1984.
 
 
 6
 Daniels returned to federal court and filed a second petition for a writ of habeas corpus on June 21, 1985. In his petition, Daniels raised the following four grounds for relief:
 
 
 7
 (1) The evidence adduced at the post-conviction hearing established that the defendant-petitioner was denied the effective assistance of counsel invoilation [sic] of his rights under the Constitution of the United States and the Constitution of the State of Ohio.
 
 
 8
 (2) The court at the post-conviction evidentiary hearing excluded evidence as to whether defense counsel investigated whether other persons who lived with the victims suffered from venereal disease in preparing his defense for the defendant-petitioner.
 
 
 9
 (3) At the post-conviction evidentiary hearing the defendant-petitioner was substantially prejudiced when the court ruled that the defendant petitioner was adequately and properly informed of his constitutional rights under the United States [sic] to a jury of twelve persons and in connection therewith with a signed waiver of trial by jury [sic].
 
 
 10
 (4) At the post-conviction evidentiary hearing the the [sic] defendant-petitioner was substantially prejudiced when the trial court ruled that trial counsel's failure to file or request a motion for discovery on denad [sic] for discovery in a criminal case did not violate an essential duty to his client.
 
 
 11
 Daniels v. Tate, No. C-1-85-1141, Rep. & Rec. of U.S.Mag. at 4 (S.D.Ohio Oct. 8, 1986) (quoting Petition for Writ of Habeas Corpus)). Respondent Arthur Tate, Jr., Superintendent of the Chillicothe Correctional Institute, filed a return of writ and contended that Daniel's claims were meritless. Daniels' petition was assigned to a magistrate.
 
 
 12
 On October 8, 1986, the magistrate recommended that Daniels' petition be dismissed. After reviewing the state trial court record, the magistrate found that Daniels failed to show that he was denied the effective assistance of counsel. The magistrate also found that Daniels was adequately advised of his right to jury trial and that he signed a valid waiver. After considering Daniels' objections to the magistrate's findings, the district court adopted the magistrate's Report and Recommendation and dismissed Daniels' petition for a writ of habeas corpus. On October 20, 1987, the district court entered judgment nunc pro tunc dismissing the petition as of October 1, 1987. This appeal followed.
 
 II.
 
 13
 In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court established a framework for reviewing claims of ineffective assistance of counsel:
 
 
 14
 First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
 
 
 15
 Id. at 687. The Supreme Court applied an objective standard to evaluate the conduct of counsel under all of the relevant circumstances. Under this approach, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." See Strickland, 466 U.S. at 688. See also Martin v. Rose, 744 F.2d 1245, 1249 (6th Cir.1984); Beasley v. United States, 491 F.2d 687, 696 (6th Cir.1974).
 
 
 16
 The Supreme Court also explained that judicial scrutiny of counsel's performance must be highly deferential:Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."
 
 
 17
 Strickland, 466 U.S. at 689, quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955). Even if counsel commits errors, the Supreme Court concluded, the decision should not be set aside unless the errors are outcome determinative. Id. at 691. Petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
 
 III.
 
 18
 On appeal, Daniels posits several arguments in support of his claim of ineffective assistance of counsel. Initially, he argues that his counsel failed to investigate the two victims' testimony that they contracted venereal disease after the rapes, which occurred on June 3, 1975. Daniels testified that he did not have venereal disease in June, 1975, and that he was not subsequently treated for venereal disease in June, July or August, 1975. Daniels contends that counsel should have had him medically examined to determine that he did not have a venereal disease, which would have conclusively established that he was not the rapist. Daniels also argues that counsel should have investigated the victims' prior sexual contacts. Thus, if the victims' associates were found free of venereal disease and Daniels was found free of venereal disease, then the evidence would have established that Daniels was not the rapist.
 
 
 19
 At the post-conviction hearing in state court, Daniels' counsel testified that he investigated the two victims, but was told that their post-rape, medical treatment for venereal disease was confidential information. Counsel also testified that he decided not to investigate the sexual health of the man with whom the two victims cohabitated. Counsel deemed evidence of the two victims' sexual behavior immaterial to his chosen defenses of alibi and mistaken identity.
 
 
 20
 A similar question involving the exculpatory value of venereal disease testing was considered by this Court in Logan v. Marshall, 540 F.Supp. 3 (N.D.Ohio 1981), aff'd, 680 F.2d 1121 (6th Cir.1982). In Logan, we held that a habeas petitioner's constitutional rights were not violated by the state trial court's ruling that he could not introduce evidence showing that his victim had gonorrhea prior to the rape. 680 F.2d at 1123. At the state court trial, defense counsel argued that the gonorrhea evidence was relevant to the issue of the origin of the semen. Invoking the Ohio Rape Shield Statute, Ohio Rev.Code Ann. Sec. 2907.02(D), the prosecution argued that the defense counsel was solely attempting to attack the character and credibility of the victim. See id. at 1122. This Court concluded that "it is clear from the list of questions offered by defense counsel and his objection to the exclusion of the gonorrhea evidence that he intended to attack the credibility of the victim with this evidence. The exclusion of inflamatory evidence is with in the discretion of the trial judge." Id. at 1123.
 
 
 21
 In light of the Logan decision, Daniels' counsel employed a reasonable trial strategy when he declined to secure and present evidence of the victims' venereal disease and past sexual histories. First, Daniels' counsel should have known that the Logan counsel failed to secure admission of evidence showing that the victim had venereal disease prior to the rape. Second, Daniels' counsel considered the cost of interviewing the two victims' past sexual partners, the dubious benefits of such evidence, and the practical problems of securing confidential medical information concerning the sexual health of the victims and their associates. After deciding that the cost of securing the venereal disease evidence was not worth the risk that such evidence would later be deemed non-exculpatory or inadmissible, Daniels' counsel employed a "sound trial strategy" and devoted his limited time and financial resources to his clients' alibi defense. See Michel, 350 U.S. at 101.
 
 
 22
 Additionally, we cannot conclude that, but for counsel's decision not to secure the venereal disease evidence, a reasonable probability exists that the result of the trial would have been different. The district court correctly concluded that if counsel erred in failing to undertake a defense based on the absence of venereal disease in his client, such error did not prejudice the outcome of the state court trial. The two victims may have contracted venereal disease prior to the rapes and Daniels may have merely escaped infection during the rapes. See Logan, 680 F.2d at 1123. Thus, even if a medical examination had demonstrated that Daniels was not suffering from a venereal disease at the time of the rapes, and could not have infected the victims, that evidence would not have conclusively rebutted the prosecutor's evidence identifying Daniels as the rapist.
 
 
 23
 Daniels also claims that his counsel failed to effectively investigate his alibi defense. Daniels argues that on the night of the rapes, June 2-3, 1975, he was at home preparing a book report for a course at the University of Cincinnati. To support these claims, counsel introduced Daniels' book report as evidence and secured testimony from Daniels' family and friends stating that they observed him at his home on the night of the rapes. Daniels has concluded that his counsel should have also secured testimony to support his alibi defense from his professor; his common-law-wife's grandmother, Sophie Watson; and a friend of his family, Florence Buckner.
 
 
 24
 We agree, however, with the district court's conclusion that counsel did not err in declining to secure testimony from these witnesses. Moreover, even if we assume that counsel did err, it was not outcome determinative. See Strickland, 466 U.S. at 694. First, the post-conviction hearing testimony of Daniels' professor reveals that she was unable to pinpoint the date on which he submitted the book report. Thus, the professor's testimony would not have augmented the defense. Second, because numerous other alibi witnesses testified that they observed Daniels at home on the night of the rapes, Sophie Watson's testimony, if offered at trial, would have merely been cumulative. Third, Florence Buckner's testimony, if offered at trial, would have substantially prejudiced the defense. Daniels' mother testified that she drove her son's car to Buckner's surprise birthday party on the night of the attacks, June 2-3, and that Daniels could not have used the car, on the same night, to perpetrate the rapes. At the post-conviction hearing, counsel testified that prior to trial, Buckner told him that the surprise party was not held on the night of June 2-3, but was held the prior Saturday. Thus, counsel's decision not to call Buckner as a witness was completely reasonable.
 
 
 25
 Daniels further alleges that counsel failed to investigate evidence that the case brought against him had been fabricated. On June 29, 1975, the two victims reported the rapes to the police. At that time, one of the victims gave the police the license number of the rapist's car. On July 28, 1975, prior to his arrest on the rape charges, Daniels was stopped by the police for a traffic violation. A computer check did not disclose a warrant for Daniels' arrest. Thus, the police did not detain him. Daniels now argues that the fact that the traffic citation computer check did not reveal his status as a rape suspect proves that his license number was added to the June 29 police report at a later date.
 
 
 26
 We are persuaded, however, by the district court's conclusion that counsel did not err in declining to present Daniels' fabrication theory. First, Daniels has not presented any evidence that his license number was not given to the police on June 29 by the rape victims. Second, because the possibility that the police fabricated the case against Daniels was remote, counsel's choice not to pursue the traffic citation issue was reasonable and fell within the wide latitude granted the strategic decisions of trial attorneys.
 
 
 27
 Daniels finally argues that counsel was ineffective because he failed to file a formal motion for discovery. At the post-conviction hearing, counsel admitted that he chose not to issue a formal discovery request. Counsel then provided reasonable arguments to justify his decision. First, counsel was provided full open-file discovery by the police investigator and the prosecutor assigned to Daniels' case. Second, counsel was satisfied that he was able to obtain information critical to the case through informal means. Third, by not making a formal request, counsel avoided reciprocal discovery to the prosecutor and maintained the surprise element of his alibi evidence at trial. Accordingly, we find no error in the district court's conclusion that counsel's decision to forego filing a formal discovery motion was reasonable. Moreover, Daniels never established that counsel failed to uncover critical evidence or that his reliance on informal discovery prejudiced the outcome of the trial.
 
 
 28
 After careful examination of the state trial court proceedings, the district court correctly found that Daniels was not denied the effective assistance of counsel. When counsel chose to focus on Daniels' alibi defense, and not to pursue unrelated theories, he made a reasonable strategic decision. By presenting several witnesses in support of Daniels' alibi defense, by vigorously cross-examining the two victims, and by filing motions to suppress identification testimony and for acquittal, counsel provided Daniels with reasonably effective legal representation. In addition, Daniels failed to establish that, but for counsel's alleged omissions, the outcome of the state court trial would have been different. Thus, the district court correctly found Daniels' claim of ineffective assistance of counsel to be without merit.
 
 IV.
 
 29
 The right to trial by jury is fundamental to American criminal jurisprudence. See Duncan v. Louisiana, 391 U.S. 145, 149 (1968); United States v. Martin, 704 F.2d 267, 271 (6th Cir.1983). The role of the jury as a fact finding body in criminal cases has been made explicit in the Sixth Amendment of the Constitution: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed...." U.S. Const. Amend. VI.
 
 
 30
 The right to trial by jury may be waived only when the defendant's decision is voluntary, knowing and intelligent. See Patton v. United States, 281 U.S. 276, 312 (1930). In Adams v. United States, 317 U.S. 269 (1942), the Supreme Court explained that "whether or not there is an intelligent, competent, self-protecting waiver of jury trial by an accused must depend upon the unique circumstances of each case." Id. at 278. Moreover, federal courts have been instructed to indulge every reasonable presumption against waiver of a fundamental constitutional right. See, e.g., Barker v. Page, 390 U.S. 719, 725 (1968); United States v. Rich, 589 F.2d 1025, 1032 (10th Cir.1978). Where a petitioner seeks release by the remedy of habeas corpus, however, the burden of proof rests upon him to establish that he did not competently and intelligently waive his constitutional rights. See Johnson v. Zerbst, 304 U.S. 458, 468-69 (1938).
 
 V.
 
 31
 In his petition for a writ of habeas corpus, Daniels claims that his waiver of a jury trial in state court was invalid because counsel failed to effectively advise him of the nature of his right. At the post-conviction evidentiary hearing, Daniels testified that his counsel told him that because he was a black man charged with the rape of two white women and because the jurors would harbor racial prejudices, he would be found guilty. Daniels next indicated that he did not understand the value of his jury trial right, but signed the waiver only because counsel instructed him to do so. Daniels then testified that although he responded affirmatively when the judge asked him whether he was waiving his right to a jury, he did not understand the meaning of the waiver.
 
 
 32
 Daniels' counsel also testified at the post-conviction hearing. Counsel stated that, prior to trial, he advised Daniels of his right to a jury and that what would be forfeited if he waived that right. Counsel indicated that he told Daniels of his unfavorable experiences in defending black men charged with raping white women. Counsel further advised Daniels to consider the prejudices of white jurors; the prosecutor's proclivity to excuse black jurors; and the judges' superior legal knowledge and ability to appreciate the alibi defense. Counsel testified that Daniels then indicated that he would like to have his case tried before the judge.
 
 
 33
 After reviewing the state trial court proceedings, the district court found that Daniels voluntarily, knowingly and intelligently relinquished his right to a jury trial. In reaching this conclusion, the district court relied substantially on the state court trial transcripts:
 
 
 34
 The Court: Mr. Daniels, do you understand that you have a constitutional right to a trial by jury on the charges that are against you?
 
 
 35
 Petitioner: Yes, sir.
 
 
 36
 The Court: O.K. And specifically we have a prospective panel of jurors waiting in the jury room. They are ready to be brought in for selection in your case.
 
 
 37
 Do you understand that by signing the waiver that has been tendered to me you are waiving your right to a jury trial?
 
 
 38
 Petitioner: Yes, sir.
 
 
 39
 The Court: Do you understand that without a jury the determination of the question of guilt on these four counts will be made solely by myself?
 
 
 40
 Petitioner: Yes, sir.
 
 
 41
 The Court: Do you understand that if with respect to any of those counts the finding is guilty it would then be me to impose sentence with respect to those charges.
 
 
 42
 Petitioner: Yes, sir.
 
 
 43
 The Court: Were you offered anything to sign a waiver of trial by jury by anyone?
 
 
 44
 Petitioner: No, sir.
 
 
 45
 The Court: Were you threatened or coerced into signing the waiver of trial by jury?
 
 
 46
 Petitioner: No, sir.
 
 
 47
 The Court: Did you do it knowingly, intelligently, and voluntarily?
 
 
 48
 Petitioner: Yes, sir.
 
 
 49
 The Court: O.K. I do have the waiver signed by Mr. Daniels and endorsed by [his counsel,] Mr. Gilday. I know, Mr. Gilday, you have discussed it with him.
 
 
 50
 Mr. Gilday: Your honor, we have discussed it at great length. I specifically requested the jury, leaving the decision of whether it was tried to the court or to the jury by Mr. Daniels, and he told me outside the courtroom a few moments ago it was his desire to try the case to the court and without a jury.
 
 
 51
 Daniels v. Tate, No. C-1-85-1141, Rep. & Rec. of U.S.Mag. at 12-13 (S.D.Ohio Oct. 8, 1986) (quoting Hamilton Cty.Ct.C.P. trial transcript)).
 
 
 52
 The district court concluded that counsel effectively advised Daniels that he retained a presumption of innocence and a right to a trial by jury. Daniels, a college student, was able to understand this discussion. Given the circumstances of Daniels' case, counsel made a reasonable strategic decision when he advised his client to waive his right to a jury trial. We are persuaded that Daniels understood the nature of his jury trial right; that Daniels was not advised that he would be found guilty; and that Daniels signed a valid waiver of his right to trial by jury.
 
 
 53
 Accordingly, the judgment of the district court is AFFIRMED.