813 So.2d 217 (2002)
Jared DOUGHERTY, Appellant,
v.
STATE of Florida, Appellee.
No. 2D00-2194.
District Court of Appeal of Florida, Second District.
April 3, 2002.
*219 Bob Dillinger, Public Defender, and J. Andrew Meyer, Special Assistant Public Defender, Clearwater, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Sonya Roebuck Horbelt, Assistant Attorney General, Tampa, for Appellee.
PER CURIAM.
In this second appearance before us, Jared Dougherty asserts that Circuit Judge Brandt C. Downey, III, committed three reversible errors, each of which would mandate reversing his conviction for first-degree felony murder. First, he alleges that Judge Downey failed to follow the clear mandate of this court in Dougherty v. State, 746 So.2d 486 (Fla. 2d DCA 1999) (Dougherty I). The State concedes that Judge Downey failed to follow this court's mandate but argues that the error does not merit reversal. We cannot agree and conclude a new trial is required. We recognize that all those involved must relive the terrible events surrounding the death of Mr. Dougherty's infant son but we will not shirk our responsibility to follow the rule of law, even in unpleasant circumstances. This responsibility, had it been followed by the trial judge, could have rendered a new trial unnecessary. Second, Mr. Dougherty challenges Judge Downey's denial of his motion to suppress statements he made to child abuse investigators. We find no merit in this issue and affirm the denial of suppression. Third, Mr. Dougherty challenges certain jury instructions used at his trial. Although our disposition in reversing and remanding for a new trial moots this issue, we address it as it may arise on remand.

Evidence Adduced At Trial
Mr. Dougherty and his girlfriend, Kathryn Spencer, the mother of his son, Brennan, were all living together in Largo, Florida, at the time of Brennan's death. Brennan was only three months old when he died. His parents had what several witnesses described as a tumultuous relationship, apparently exacerbated in part by Mr. Dougherty's alcohol and substance abuse problems. Brennan was born prematurely with respiratory and gastrointestinal problems that required special medical care and often resulted in sleepless nights for both him and his parents. Both Mr. Dougherty and Ms. Spencer were involved in Brennan's day-to-day care.
*220 On the evening of March 11, 1999, Brennan was left with babysitters while his parents went out for the evening. They did not return until the early hours of March 12. Mr. Dougherty later admitted that he had had several beers during this time. Ms. Spencer then left the apartment to spend time at the Jacuzzi in their apartment complex with friends, and Mr. Dougherty stayed home with Brennan. Not long afterward, Mr. Dougherty drove up with Brennan in the car to the area where Ms. Spencer was, yelling at her, and insisting that she return home because something was wrong with the baby. She checked the baby and nothing seemed amiss except for a small red mark on his forehead, but she returned home nonetheless. Back at the apartment, they got into a heated argument and, when she threatened to leave with the baby, Mr. Dougherty called the police. The police arrived, interviewed the parents, and recommended that they spend the remainder of the evening apart to cool off. The police determined that the baby was safe with Mr. Dougherty and left him there. Ms. Spencer went to a friend's apartment in the complex to stay the rest of the night.
Thereafter, Mr. Dougherty telephoned several times to the apartment where Ms. Spencer was staying, and tried to convince her to come home. She refused, however, relying on the directions the police officers had given them earlier. Finally, around 6:30 a.m., he called her to say that something was seriously wrong with the baby. She returned home immediately and found Brennan in considerable distress. His color was gray, his head was swollen, and he was making unusual noises. The paramedics were called; they took him to the hospital. Mr. Dougherty rode there in the ambulance with the baby, and Ms. Spencer's father drove her to the hospital.
Hospital personnel were suspicious about some marks on the baby and called in the Child Protection Team (CPT) from the Department of Children and Family Services (DCF). Detective William Shaw of the Largo Police Department went to the hospital that morning to speak to the family members about the hospital personnel's suspicions. He requested that Mr. Dougherty and Ms. Spencer accompany him to the police station to be interviewed, and they agreed. Detective Shaw drove the two of them to the station in his car, and Mr. Spencer, the baby's maternal grandfather, followed them in his own car. At the time they left, the hospital was arranging to transport the baby to a children's hospital in Tampa and the three family members planned on driving there after they finished talking to Detective Shaw.
At the police station, Detective Shaw first interviewed Ms. Spencer and then Mr. Dougherty. The detective audiotaped his interview with Mr. Dougherty. He started the interview by informing Mr. Dougherty that he was not under arrest, that he could stop the interview whenever he wanted, and that he was free to get up and walk out at any time. About fifteen minutes into the interview, Mr. Dougherty admitted that the baby's injuries occurred under his care, that he may have gotten a little rough with the baby out of frustration and intoxication, and that he was angry at the time. These statements caused the detective to read Mr. Dougherty his Miranda[1] rights, after which Mr. Dougherty refused to answer any more questions. Detective Shaw responded, "No problem. That concludes the interview." He did not place Mr. Dougherty under arrest and intended to leave to talk to the baby's grandfather when Mr. Dougherty *221 asked about leaving the police station to go see the baby at the hospital in Tampa. The detective said he would finish the remaining interview as quickly as possible. Detective Shaw then left the room.
Upon leaving the interview room, the detective encountered the CPT investigator, Ms. Christine Martin, who was accompanied by a DCF intern. They had been dispatched upon receiving a report of possible abuse. The detective briefed them regarding his knowledge of the situation and the baby's condition. Upon learning from the detective that the baby's father was there at the police station, Ms. Martin asked if they could speak to him. Detective Shaw said he had no problem with that but did not know if Mr. Dougherty was willing to speak with them. He did not accompany the investigators back into the interview room, did not suggest any questions they might ask Mr. Dougherty, and did not listen to their conversation with him.
Ms. Martin, along with her intern, entered the interview room, explained to Mr. Dougherty why they were there, and asked if he would speak with them. He was apparently willing to speak with them because he gave them a narrative of the night's events. His conversation with them was not recorded. According to Ms. Martin, he told them that the baby was crying a lot that night, and, in frustration, he shook him a little and then slammed him down onto the floor. Upon turning on a light he realized the baby's head looked different; he became concerned and called Ms. Spencer. Following this interview, Ms. Martin informed the detective of what Mr. Dougherty had told them, and the detective then placed Mr. Dougherty under arrest.
A few days later the baby died while still in the hospital. An autopsy revealed that the baby had four skull fractures and several brain injuries. Some of the head injuries showed signs of healing, indicating that they had been incurred sometime prior to the night of March 11-12, 1999. The most recent brain injuries, apparently inflicted by blunt trauma, were the cause of death. Mr. Dougherty was indicted for first-degree felony murder based on aggravated child abuse and further charged with aggravated child abuse for the baby's earlier injuries. The State sought the death penalty.

Pretrial Proceedings and Dougherty I

Several issues arose prior to trial. Mr. Dougherty's incriminating statement to Ms. Martin, the child abuse investigator, was the subject of a motion to suppress. Judge Downey ultimately denied the motion to suppress, finding that Mr. Dougherty was not in custody at the time he gave the statement to Ms. Martin. On July 30, 1999, defense counsel filed a motion to disqualify Judge Downey based on a fear that the judge was prejudiced against Mr. Dougherty and biased in favor of police officers. The motion to disqualify explained that this apprehension arose from comments that Judge Downey had recently made, on July 15, 1999, in an unrelated criminal case where he had admonished the jury for not believing the testifying officers and for finding the defendant, Johnny Lee Nathan, not guilty.[2] Judge Downey's admonishment to the jury in Mr. Nathan's case had received widespread publicity; nevertheless, Judge Downey refused to disqualify himself from Mr. Dougherty's case. Mr. Dougherty then filed a writ of prohibition in this court. Although we denied the writ in Dougherty I, we concluded that as long as jury selection *222 was done in the manner outlined in our opinion, defense counsel's concerns would not legally warrant Judge Downey's disqualification. This court stated that, although Judge Downey's comments were ill-advised, they did not demonstrate that he would be unable to dispose of Mr. Dougherty's case fairly and without prejudice.[3] We issued clear directions for what needed to be done upon remand:
Dougherty's concern over the tainting of prospective jurors due to their fear of criticism from the judge can be adequately addressed at voir dire. We recognize that questions broaching this subject might educate potential jurors, who were previously unaware of Judge Downey's comments, about those comments. This could cause prejudice that would otherwise not exist. To prevent this from happening, we conclude that Judge Downey must allow individual voir dire on this issue. Counsel, in conducting individual voir dire outside the presence of the remaining jury pool, shall be entitled to determine whether each juror has knowledge of Judge Downey's improper comments, as well as the extent of that knowledge. Individual voir dire should be limited to that issue, and counsel shall be given wide latitude to fully explore the impact, if any, of that knowledge on each individual. If a potential juror indicates that his or her decision may be influenced due to Judge Downey's comments in the Nathan case, those individuals may, upon challenge, be excused for cause from further service in this case.
746 So.2d at 488 (footnote omitted). In addition to this directive, we made the following suggestion in footnote two:
This opinion addresses only Dougherty's petition to overturn the order of Judge Downey denying Dougherty's motion for disqualification. However, it would seem prudent for Judge Downey, in all criminal cases over which he presides for at least the next ninety days, to permit the same individual voir dire set forth in this opinion.
Id. at n. 2.
Judge Downey followed our recommendation and allowed individual voir dire on this issue in all cases over which he presided for the next ninety days. Unfortunately, jury selection in Mr. Dougherty's trial did not commence until after the expiration of the ninety-day period. When Mr. Dougherty's defense counsel requested individual voir dire as had been directed in Dougherty I, Judge Downey refused to permit it because it was beyond the ninety-day limit. Mr. Dougherty's trial proceeded without allowing defense counsel to individually voir dire any juror to determine possible taint from Judge Downey's improper comments in the Nathan case.
After all the evidence was presented, two issues arose regarding jury instructions. Defense counsel requested that an instruction on the lesser-included offense of child abuse be given and that the instruction on aggravated child abuse be clarified as to what constituted "abuse." Judge Downey denied both requests. During deliberations the jury sent back a question on aggravated child abuse, the crime underlying the felony murder charge, that tended to show that they were unclear about what "willingly or knowingly" meant. Judge Downey reinstructed them to use their common sense understanding of those words.
The jury returned a verdict of guilty to murder in the first degree as charged. Mr. Dougherty waived a penalty-phase jury and, after finding that the mitigating *223 circumstances outweighed the aggravating circumstances, Judge Downey sentenced him to a life sentence without possibility of parole. Mr. Dougherty then pleaded no contest to the charge of aggravated child abuse based on Brennan's earlier injuries, which had been severed from the felony murder charge for trial. Judge Downey sentenced him to thirty-five months' incarceration for the earlier aggravated child abuse, to be served concurrently with the life sentence for the felony murder.

Failure To Follow Previous Mandate From This Court
Article I, section 16, of the Florida Constitution and the Sixth Amendment to the United States Constitution, individually and collectively, guarantee an accused the right to a jury trial in a criminal case. Not only does this right include an entitlement to an impartial jury, it also provides an accused a safeguard against "the compliant, biased, or eccentric judge." Duncan v. Louisiana, 391 U.S. 145, 156, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). Because "trial by jury in criminal cases is fundamental to the American scheme of justice," id. at 149, 88 S.Ct. 1444, the failure to accord a defendant a fair hearing violates the minimum standards of due process. Morgan v. Illinois, 504 U.S. 719, 727, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).
At trial, through the process of individual voir dire, Mr. Dougherty's counsel sought to protect his right to an impartial jury by determining whether any juror had been tainted by Judge Downey's previous ill-advised and judicially improper comments. This process was required, in fact, by Judge Downey's comments, and, in law, by Dougherty I.
By denying defense counsel individual voir dire on the limited issue identified in Dougherty I, Judge Downey infringed upon Mr. Dougherty's constitutional right to an impartial jury. Additionally, because the trial judge permitted no inquiry, there is no record evidence to demonstrate the lack of harmful error. In light of the publicity Judge Downey's earlier comments generated, it cannot be assumed that each member of the venire was without knowledge of Judge Downey's reprimand to the jury in the Nathan case.[4]
In cases of constitutional error, the general rule is that such an error does not automatically require a reversal of a conviction as most errors can be considered harmless. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Harmless error, in the constitutional context, involves a trial error that occurred during the presentation of the case to a jury. Thus, the error can be "quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." Arizona v. Fulminante, 499 U.S. 279, 307-08, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).
However, certain constitutional errors are "structural defects in the constitution of the trial mechanism, which defy analysis by `harmless-error' standards." Id. at 310, 111 S.Ct. 1246. These constitutional defects affect "the framework within which the trial proceeds, rather than simply an error in the trial process itself." Id.
We hold that the denial of court-ordered voir dire is a structural defect invalidating the very framework of Mr. Dougherty's trial and not the presentation of the case to a jury. This per se error is not subject to a quantitative analysis but prejudice is *224 presumed, and Fulminante mandates a reversal.
Although a closer call, we also conclude that were Chapman's harmless error standard to be applied, reversal would nevertheless be required. Before "a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Chapman, 386 U.S. at 24, 87 S.Ct. 824. The purpose of Dougherty I was prophylacticto protect the defendant's right to a fair trial and ensure that the jury was impartial and uninfluenced by Judge Downey's earlier jury criticism. Had Judge Downey followed our directive and permitted defense counsel individual questioning on the issue, counsel might well have established that, given the passage of time, no taint remained from Judge Downey's earlier improper comments, and any fear on Mr. Dougherty's and his counsel's part had dissipated. Because we have no such evidence, despite defense counsel's attempt to make a record, and because Judge Downey refused to follow our clear directive, we cannot find the error harmless beyond a reasonable doubt.
Thus, regardless of the applicable standard of review, Judge Downey's blatant disregard of our mandate requires a new trial.

Jury Instructions
We also agree with Mr. Dougherty's argument relating to misinstructing the jury on simple child abuse as a lesser-included offense of aggravated child abuse, but disagree with his argument that the trial judge erred in refusing to clarify what "willingly and knowingly" meant. At trial, a large body of evidence was presented that young Brennan had been horridly abused. The State prosecuted Mr. Dougherty on a charge of first-degree felony murder, a capital felony, based on an underlying felony of aggravated child abuse, a second-degree felony defined in section 827.03(2), Florida Statutes (1997). At the jury charge conference, defense counsel requested an instruction on child abuse, a third-degree felony violation of section 827.03(1), as a lesser-included offense of aggravated child abuse. In the Schedule of Lesser Included Offenses of the Florida Standard Jury Instructions in Criminal Cases applicable at the time this crime was committed, simple child abuse is listed as a category 2 lesser-included offense of aggravated child abuse. This means that if requested, and if there is evidence to support the charge, the instruction must be given. State v. Espinosa, 686 So.2d 1345 (Fla.1996). Because both of these requirements were met, the judge should have given the requested instruction as part of both the felony murder instruction and when he was instructing on aggravated child abuse as a lesser-included of first-degree murder (felony murder). See State v. McDonald, 785 So.2d 640 (Fla. 2d DCA 2001); Raford v. State, 792 So.2d 476 (Fla. 4th DCA), review granted, 790 So.2d 1107 (Fla.2001); see also Koenig v. State, 757 So.2d 595 (Fla. 5th DCA 2000).
In summary, we affirm the denial of suppression of Mr. Dougherty's incriminating statements to Ms. Martin, but reverse the conviction and sentence and remand for a new trial in accordance with this opinion and the opinion in Dougherty I. Upon remand, the trial shall be held before a different judge.
Reversed and remanded with instructions.
PARKER, ALTENBERND, and CASANUEVA, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Judge Downey's comments are set forth in Dougherty v. State, 746 So.2d 486, 487 (Fla. 2d DCA 1999) (Dougherty I), so need not be detailed here.
[3] Dougherty I, 746 So.2d at 488.
[4] We make no determination whether Judge Downey's conduct rises to a level warranting Judicial Qualifications Commission intervention.